**Margo POLETT and Daniel Polett, Appellees**

**v.**

**PUBLIC COMMUNICATIONS, INC., Zimmer, Inc., Zimmer USA, Inc., and Zimmer Holdings, Inc., Appellants.**

Superior Court of Pennsylvania.

Argued Oct. 16, 2013.

Filed Dec. 20, 2013.

Brian M. Ercole and James D. Pagliaro, Philadelphia, for appellants.

Shanin Specter, Philadelphia, for appellees.

BEFORE: BENDER, P.J., FORD ELLIOTT, P.J.E., BOWES, GANTMAN, DONOHUE, SHOGAN, LAZARUS, OLSON and WECHT, JJ.

OPINION BY SHOGAN, J.:

Appellants, Public Communications, Inc. ("PCI"), and Zimmer, Inc., Zimmer USA, Inc. and Zimmer Holdings, Inc. (collectively "Zimmer"), appeal from the entry of judgment in favor of Margo Polett ("Mrs. Polett") and Daniel Polett, her husband. After careful review, we vacate and remand for a new trial.

In May of 2006, Zimmer launched the Gender Solutions Knee, a new knee replacement device designed specifically for women. Zimmer hired the marketing firm of PCI to produce a sales video, which would include interviews and footage of patients who had undergone successful knee replacement surgery using the Gender Solutions Knee.

Mrs. Polett suffered from degenerative rheumatoid arthritis, resulting in knee problems and inflammatory disturbances to soft tissue. She also had a medical history of hypertension, anxiety, and elevated liver enzymes. In 2003, Mrs. Polett underwent left knee replacement surgery. By May of 2006, she was having trouble with her left knee and arthritic issues with her right knee. On May 31, 2006, Mrs. Polett consulted with Dr. Richard Booth, an orthopedic surgeon and co-developer of the Gender Solutions Knee.

Upon the recommendation of Dr. Booth, Mrs. Polett underwent successful bilateral knee replacement surgery on June 27, 2006, at age 67. During the surgery, Dr. Booth replaced her prosthetic left knee with a new one and inserted a Gender Solutions Knee in the right knee. During

a post-operative visit on August 16, 2006, Dr. Booth noted that Mrs. Polett was doing extremely well. Consequently, he recommended Mrs. Polett to Zimmer as a successful Gender Solutions Knee patient. Mrs. Polett agreed to participate in Zimmer's sales video. On August 23, 2006, PCI supervised the videotaping of Mrs. Polett being examined by Dr. Booth, walking in a garden with her daughter, walking on a treadmill, and riding a stationary exercise bike.[1]

At a follow-up visit with Dr. Booth on September 20, 2006, a month after the videotaping, Mrs. Polett reported "mild discomfort in her knees after riding on a bicycle." Trial Exhibit P3 (Postoperative Visit Summary, 9/20/06). Between the bilateral knee replacement surgery on June 27, 2006, and the September 20, 2006 appointment with Dr. Booth, Mrs. Polett walked on the beach, swam, drove, attended social events, traveled to the Poconos and Vietnam, and went to physical therapy where, contrary to Dr. Booth's instructions, she did leg exercises using resistive force.

At the next follow-up visit on October 23, 2006, Mrs. Polett complained of "persistent discomfort in both knees." Trial Exhibit P4 (Postoperative Visit Summary, 10/23/06). Over time, Mrs. Polett's knees became inflamed and swollen; she suffered falls and a fractured right patella; a tendon in her right knee ruptured; and, she endured four surgeries in failed attempts to repair the damage.

The trial court summarized the procedural history of this case as follows:

In August, 2008, Mrs. Polett commenced this litigation against Zimmer and PCI. Mr. Polett has a claim for loss of consortium. Following a week-long trial, on November 19, 2010 the jury awarded the plaintiffs $27.6 million in damages. The jury determined that Zimmer was 34% causally negligent; that PCI was 36% causally negligent; and, that Mrs. Polett was 30% comparatively negligent.

On June 10, 2011, the post-trial motions of Zimmer and PCI were denied. Judgment was entered in favor of both plaintiffs. Zimmer and PCI filed a Notice of Appeal, then subsequently filed a Concise Statement of the Errors Complained of on Appeal, dated July 28, 2011.

Trial Court Opinion, 8/4/11, at 2.

On appeal, Zimmer and PCI presented six questions for review, which we reordered for ease of disposition: [2]

1. Whether Defendants are entitled to judgment notwithstanding the verdict on Plaintiffs' claims, because Plaintiffs failed to present sufficient evidence, at trial, for a reasonable jury to have found that the use of an exercise bike and treadmill by Mrs. Polett for a few minutes during an educational video was the proximate, direct, and/or actual cause of not just Mrs. Polett's initial synovitis (mild inflammation in her knee), but each of her subsequent, more serious knee injuries and surgeries over several years?

2. Whether Defendants are entitled to judgment notwithstanding the ver-

---

[1] The parties' dispute focuses more on Mrs. Polett's use of the exercise bike than the treadmill. Thus, we shall refer only to the bike.

[2] Zimmer and PCI seek one of three forms of relief: judgment notwithstanding the verdict ("JNOV"), a new trial, or remittitur. Because entry of JNOV would render the alternative requests for relief moot, we address the two JNOV issues first.

dict on Plaintiffs' claims, because Plaintiffs failed to present sufficient evidence, at trial, for a reasonable jury to have found that Defendants breached their limited duty not to subject Mrs. Polett to a reasonably foreseeable risk of harm when Mrs. Polett voluntarily used an exercise bike and treadmill for a few minutes during an educational video?

3. Whether Defendants are entitled to a new trial because the trial court's causation-related jury instructions, over Defendants' objection, improperly shifted onto Defendants the burden of disproving the causation element of Plaintiffs' claims, improperly required Defendants to present affirmative medical testimony to disprove the existence of causation, and were otherwise misleading, confusing, and prejudicial?

4. Whether Defendants are entitled to a new trial when the court improperly denied Defendants' motion *in limine* to preclude the causation testimony of Plaintiffs' lone causation expert, Dr. Booth, who was never disclosed as a testifying expert prior to trial and who could not offer opinions with sufficient certainty?

5. Whether Defendants are entitled to a new trial because the trial court improperly precluded Defendants from impeaching Dr. Booth's causation testimony at trial, when the trial court prevented Defendants from showing that when Dr. Booth first gave causation testimony in favor of Plaintiffs and against Defendants, Dr. Booth was subject to a Tolling Agreement that extended the period of time during which Plaintiffs could bring claims against Dr. Booth and was himself a defendant in this action?

6. Whether the trial court erred in refusing to remit the jury's $27.6 million compensatory damages award, or, in the alternative, in refusing to grant a new trial, because the jury award was, as a matter of law, excessive, conscience-shocking, and not justified by the evidence presented against Defendants at trial, particularly when Mrs. Polett did not suffer a catastrophic injury, did not assert a claim for out-of-pocket expenses, lost earning potential, or punitive damages, remains physically able to do many of the same things that she did before her knee injury, and continues to enjoy a happy and successful marriage[?]

Zimmer and PCI's Brief at 3–4.

Upon review of Zimmer and PCI's issues, a panel of this Court filed a memorandum vacating the judgment in favor of Mrs. Polett and her husband and remanding for a new trial. *Polett v. PCI*, 1865 EDA 2011 (Pa.Super. filed February 28, 2013) (unpublished memorandum). Thereafter, Mrs. Polett filed a motion for reargument *en banc*. We granted the motion and heard oral arguments on October 15, 2013. This matter is now ripe for disposition.

In their first two issues, Zimmer and PCI seek judgment notwithstanding the verdict ("JNOV"). This Court has articulated our standard of review from the denial of a motion seeking JNOV as follows:

In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a

trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

There are two bases upon which a judgment N.O.V. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Ty–Button Tie, Inc. v. Kincel and Co., Ltd.,* 814 A.2d 685, 690 (Pa.Super.2002) (quoting *Goldberg v. Isdaner,* 780 A.2d 654, 659–660 (Pa.Super.2001)) (internal citations and quotation marks omitted).

■ Zimmer and PCI argue they were entitled to JNOV because Mrs. Polett failed to present sufficient evidence of a causal connection between riding the exercise bike and her injuries. Zimmer and PCI's Brief at 29. The trial court opined that Dr. Booth's testimony "provided sufficient evidence for the jury to determine that the bicycle ride was the causal nexus which brought about Mrs. Polett's injuries." Trial Court Opinion, 6/10/11, at 19. We agree.

[W]hen it is established that the defendant breached some duty of care owed the plaintiff, it is incumbent on a plaintiff to establish a causal connection between defendant's conduct and the plaintiff's injury. Stated another way,

the defendant's conduct must be shown to have been the proximate cause of plaintiff's injury. Proximate cause is a term of art denoting the point at which legal responsibility attaches for the harm to another arising out of some act of defendant; and it may be established by evidence that the defendant's negligent act or failure to act was a substantial factor in bringing about the plaintiff's harm. The defendant's negligent conduct may not, however, be found to be a substantial cause where the plaintiff's injury would have been sustained even in the absence of the actor's negligence.

*Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280, 1284 (1978) (internal citations omitted).

■ It is not enough "that a negligent act may be viewed, in retrospect, to have been one of the happenings in the series of events leading up to an injury." *Eckroth v. Pennsylvania Elec., Inc.,* 12 A.3d 422, 427 (Pa.Super.2010) (quoting *Brown v. Philadelphia College of Osteopathic Medicine,* 760 A.2d 863, 868 (Pa.Super.2000)). Thus, in determining whether a party's conduct is a substantial factor in bringing about harm to another, the court must consider the following:

§ 433. Considerations Important in Determining Whether Negligent Conduct is Substantial Factor in Producing Harm.

The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;

(c) lapse of time.

Restatement (Second) of Torts § 433.

■ Viewing the evidence in the light most favorable to Mrs. Polett, the record contains sufficient proof of a causal connection between Mrs. Polett riding the exercise bike and her subsequent injuries. The jury heard evidence of multiple factors related to Mrs. Polett's condition, such as her active lifestyle, rheumatoid arthritis, exercising with resistive weights, riding the exercise bike, and wearing the leg brace improperly. However, Dr. Booth testified that Mrs. Polett developed synovitis in her right knee after riding the exercise bike. N.T., 11/15/10 (p.m.), at 5, 11, and Trial Exhibit P3. Although Dr. Booth noted this was a minor condition, he explained that the synovitis resulted in a loss of motion and an unstable knee. *Id,* at 9–10, 14, and Trial Exhibit P4. The instability created a chain of events, including falls, a patellar fracture, and, eventually, ruptured tendons. *Id,* at 19, 20–22, 24–25, 133, 142. Albeit less directly than Dr. Booth, the defense expert, Dr. Clark, also testified that riding the bike contributed to Mrs. Polett's injuries. N.T. (Clark Deposition), 11/12/10, at 13, 24, and 33.

Based on the foregoing evidence, we conclude Mrs. Polett presented sufficient evidence for a jury to find that riding the exercise bike was a substantial factor in causing Mrs. Polett's injuries. Thus, the trial court did not err in denying Zimmer and PCI's motion for JNOV.

■ Next, Zimmer and PCI argue they were entitled to JNOV because Mrs. Polett failed to present sufficient evidence that they breached their limited duty not to subject her to a reasonably foreseeable risk of harm. Zimmer and PCI's Brief at 56. The trial court denied Zimmer and PCI's request for JNOV on this basis because, in its opinion, "[t]he risk of injury to Mrs. Polett's knee was not remote, nor hidden, nor unexpected. Injury was not only reasonably foreseeable, the risk of injury was actually foreseen and could have been prevented with reasonable care." Trial Court Opinion, 6/10/11, at 15.

On appeal, Zimmer and PCI argue that "no reasonable juror could have found that [they] breached their limited duty of care to Mrs. Polett, because, under the circumstances, the risk of general injury to Mrs. Polett from using a treadmill and exercise bike for a few minutes during the August 23, 2006 video shoot was not reasonably foreseeable." Zimmer and PCI's Brief at 57. Mrs. Polett counters that the testimonial evidence belies Zimmer and PCI's arguments against the foreseeability of Mrs. Polett's injuries. Mrs. Polett's Brief at 14–15.

■ "The test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm to the injured person, resulting from his act." *Dahlstrom v. Shrum,* 368 Pa. 423, 84 A.2d 289, 290 (1951) (citation omitted). Foreseeability is the likelihood of the occurrence of a general type of risk; it does not mean the likelihood of the occurrence of the precise chain of events leading to an injury. *Huddleston v. Infertility Center of America, Inc.,* 700 A.2d 453, 460 (Pa.Super.1997); *see also Thornton v. Weaber,* 380 Pa. 590, 112 A.2d 344, 347 (1955) ("What must be foreseen, in order to establish negligence, is harm in the abstract, not harm in the concrete."). A defendant is not required to guard against every possible risk; however, he must take rea-

sonable steps to guard against generally foreseeable hazards. *Huddleston,* 700 A.2d at 460 (citation omitted).

Viewing the evidence in the light most favorable to Mrs. Polett, the record reveals that Zimmer and PCI learned through interviewing Mrs. Polett about her pre-operative and post-operative activities, including her interest in bike riding. N.T., 11/16/10 (a.m.), at 49–51, 56–57, 59; N.T., 11/16/10 (p.m.), at 15–16, 30–31; N.T., 11/17/10 (a.m.), at 52–53. They understood that Mrs. Polett could be injured if there was a misunderstanding about what she could do or if she engaged in activity that she was not medically cleared to do. N.T., 11/16/10 (p.m.), at 90; N.T., 11/17/10 (a.m.), at 14, 34. Dr. Booth testified that riding a bike after knee surgery "will sometimes inflame the knee," causing a loss of motion. N.T., 11/15/10 (a.m.), at 124; N.T., 11/15/10 (p.m.), at 5. Moreover, Mrs. Polett was subject to an increased risk of harm because of her rheumatoid arthritis. N.T., 11/15/10 (p.m.), at 8. Zimmer and PCI took some measures to ensure Mrs. Polett's safety during the videotaping, such as asking what she was comfortable doing and not increasing her speed on the equipment, because her "safety comes first." N.T., 11/16/10 (a.m.), at 54, 66, 106; N.T., 11/16/10 (p.m.), at 5–6, 61–62, 63–64, 68; N.T., 11/17/10 (a.m.), at 14. Zimmer and PCI learned from Mrs. Polett on the day of the videotaping that she had not ridden a bicycle since her surgery; at that point, they deferred to her comfort level in choosing an activity. N.T., 11/16/10 (a.m.), at 50–52, 66, 100; N.T., 11/16/10 (p.m.) at 119–120; N.T., 11/17/10 (a.m.), at 9, 41–42, 83–84, 87. Ms. Yoder, the Zimmer employee in charge of filming, acknowledged that Mrs. Polett's disclosure about not having ridden a bike was inconsistent with the videotaping plan, a surprise, and initially a "red flag." N.T., 11/17/10 (a.m.) at 9, 41, 53, 86–87.

Based on the foregoing evidence, we conclude Mrs. Polett sufficiently established that Zimmer and PCI could reasonably foresee the general nature of the risk and harm resulting from a patient using an exercise bike one month after bilateral knee surgery. Thus, we further conclude the trial court did not err in denying Zimmer and PCI's motion for JNOV.

■■■ We turn to Zimmer and PCI's third, fourth, and fifth issues, in which they assert the trial court erred in denying their requests for a new trial based on allegations of jury instruction and evidentiary errors.

Our standard of review from an order denying a motion for a new trial is whether the trial court committed an error of law, which controlled the outcome of the case, or committed an abuse of discretion. A trial court commits an abuse of discretion when it rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.

*Mirabel v. Morales,* 57 A.3d 144, 150 (Pa.Super.2012) (internal citations and quotation marks omitted).

■■ Zimmer and PCI's third issue challenges the trial court's causation instruction to the jury. Specifically, Zimmer and PCI claim (1) the trial court improperly imposed on them the burden of disproving causation, and (2) the causation charge, as a whole, was "confusing, misleading, and erroneous." Zimmer and PCI's Brief at 46, 49. In response, Mrs. Polett argues that Zimmer and PCI have waived this issue because defense counsel failed to object in a timely manner at trial. Mrs. Polett's Brief at 38–39.

Initially, we note that the record refutes Mrs. Polett's waiver argument. During

the charging session on the morning of November 18, 2010, defense counsel argued for "a charge that simply says you may not speculate." N.T., 11/18/10 (a.m.), at 44–45. Mrs. Polett's counsel argued for a narrower charge about the need for medical evidence of some other cause. *Id*, at 46–47. After much discussion, the trial court and counsel agreed that the issue of speculation would arise—if at all—during closing arguments; therefore, the trial court ruled that it would "hold this [particular charge] under advisement." *Id*, at 47–50, 51.

Before the trial court began its charge to the jury, defense counsel sought clarification regarding how he should preserve challenges to the court's instructions:

MR. CONROY: Once the charge is given, Your Honor, then I'll need to make an exceptions [sic] again to the charge and should we do it after the jury is released for lunch? I can do it quickly then or take, you know, two minutes to put it on the record. How does that sound?

THE COURT: After the charge, right, we'll take our lunch break and then you can do it then because—

[PLAINTIFFS' COUNSEL]: I think this may be of assistance to Mr. Conroy. I think everything has been recorded very well by—

THE COURT: **You haven't waived anything.**

MR. CONROY: I agree, but just out of an abundance of caution, I prefer—

THE COURT: That's not a problem.

MR. CONROY:—to do it after the charge. I'll incorporate back into the record the reasons I articulated.

THE COURT: All right.

N.T., 11/18/10 (a.m.), at 57–58 (emphasis supplied). The trial court then instructed the jury; as expected, the instructions did not include a speculation charge. *Id*, at 63–90. Following the trial court's charge, defense counsel restated a list of objections to the verdict sheet and the jury instructions. *Id*, at 91–93.

The afternoon session began with closing arguments. While addressing the jury, defense counsel discussed Mrs. Polett's medical history and post-operative activities. N.T., 11/18/10 (p.m.), at 85–87, 98–102. This triggered the speculation charge, which the trial court gave at the request of Mrs. Polett's counsel prior to his rebuttal closing:

Ladies and gentlemen, we're getting ready to hear the response or rebuttal closing argument by [Mrs. Polett's counsel].

And I wanted to alert you and just add to my earlier instruction that in order for you to find that something other than the exercise bike caused Mrs. Polett's injuries, you must be provided with medical testimony that something else other than the bike caused those injuries. You may not speculate on what else could have caused Mrs. Polett to be injured.

*Id.* at 104–105. After Mrs. Polett's counsel presented his closing, the trial court gave final instructions to the jurors and dismissed them to begin deliberations. *Id*, at 121. Defense counsel then raised an objection to the trial court's speculation charge:

Mr. CONROY: The second issue is I object to the charge that the Court gave to the jury on the speculation issue after [cocounsel's] closing argument—

THE COURT: Yes.

MR. CONROY:—I think that—

THE COURT: You made that clear during the robing ceremony. And we said that we would wait to hear based on

what the closing arguments were. I understand—

MR. CONROY: But I need to say on the record what has happened: That I object to the fact that it was given, because I think the effect of it is shifting the burden of proof that the plaintiff has back on the defendants. The way the evidence was argued I believe was proper.

THE COURT: I appreciate that. Thanks, Mr. Conroy.

*Id.* at 122–123.

Our review of the record indicates that defense counsel first raised this issue during the charging conference, noting his objection to anything but a simple "you may not speculate" instruction. N.T., 11/18/10 (a.m.), at 44. Prior to the original charge, the trial court assured counsel he had not waived any exceptions. *Id.* at 57–58. After its final instructions to the jury, the trial court acknowledged defense counsel's continued objection to the narrow speculation charge. *Id.* at 122–123. Based upon this record, we conclude that defense counsel's objection to the speculation charge was timely. Therefore, Zimmer and PCI properly preserved this issue.

■■■ Turning to the merits of Zimmer and PCI's challenge to the causation charge, we recognize that:

[a] trial judge has wide latitude in instructing a jury. S/he may use any particular language, as long as the words sufficiently and fully convey the rules of law applicable to the case. *Pagesh v. Ucman,* 403 Pa.Super. 549, 589 A.2d 747 (1991); *Beary v. Container General Corp.,* 368 Pa.Super. 61, 78, 533 A.2d 716, 724 (1987).

*Bailey v. Pennsylvania Elec. Co.,* 409 Pa.Super. 374, 598 A.2d 41, 49 (1991).

Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case.

Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error.

*Gorman v. Costello,* 929 A.2d 1208, 1211–1212 (Pa.Super.2007) (quoting *Quinby v. Plumsteadville Family Practice, Inc.,* 589 Pa. 183, 907 A.2d 1061, 1069–1070 (2006)) (internal citations and emphasis omitted).

[A] jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.

Furthermore,

[i]n reviewing a trial judge's charge, the proper test is not whether certain portions taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.

*Estate of Hicks v. Dana Companies, LLC,* 984 A.2d 943, 972 (Pa.Super.2009) (*en banc*) (quoting *Betz v. Erie Ins. Exchange,* 957 A.2d 1244, 1260–1261 (Pa.Super.2008), and *Schmidt v. Boardman Co.,* 958 A.2d 498, 515 (Pa.Super.2008)) (internal citations and quotation marks omitted).

We reiterate the jury instruction at issue:

> **THE COURT:** Ladies and gentlemen, we're getting ready to hear the response or rebuttal closing argument by [Mrs. Polett's counsel].
>
> And I wanted to alert you and just add to my earlier instruction that in order for you to find that something other than the exercise bike caused Mrs. Polett's injuries, you must be provided with medical testimony that something else other than the bike caused those injuries. You may not speculate on what else could have caused Mrs. Polett to be injured.

N.T., 11/18/10 (p.m.), at 105. Zimmer and PCI argue that this instruction shifted the burden of proof to them, thereby misleading the jury. We agree.

 "[A]bsent special circumstances [such as raising an affirmative defense] . . . the defendant carries no burden of proof. *See* Pa. SSJI [Suggested Standard Jury Instructions] 1159 5.50(Civ), 3.00(Civ) and 3.03(Civ)." *Kennedy v. Sell*, 816 A.2d 1153, 1159 (Pa.Super.2003). In other words, a defendant may choose simply to argue that the plaintiff has not met its burden of proof, without presenting any evidence. In such a situation, the jury may find for the defendant. *Id.* Moreover, Pennsylvania case law "does not require a defendant . . . to present independent medical testimony specifically linking the alleged injuries to another cause." *Id.*

 Here, the trial court included in its original charge instructions on a plaintiff's burden of proof regarding the defendant's negligence and on a defendant's burden of proof regarding the plaintiff's comparative negligence. N.T., 11/18/10 (a.m.), at 73–77. However, the challenged instruction occurred after the trial court's main charge to the jury and counsels' closing arguments. Isolated from the rest of the charge, the challenged instruction improperly focused the jury's attention on the idea that Zimmer and PCI were required to do more than prove Mrs. Polett's comparative negligence. According to the instruction, Zimmer and PCI were required to present **medical evidence** that something other than the exercise bike caused Mrs. Polett's injury. N.T., 11/18/10 (p.m.), at 105. Viewing the charge as a whole, including the addendum, we conclude that the challenged instruction clearly shifted the burden of proving negligence to the defendants and is contrary to the law.

Compounding the error, Mrs. Polett's counsel seized upon the instruction in his rebuttal argument:

> I think the Court's instruction to you says it all. You just—well, first of all, it's the law. You must follow the Court's instructions. You took an oath to do that.
>
> And the Court has to give that charge to you now after all the other charges because of what just happened, which is this generalized trashing of Mrs. Polett, generalized trashing . . .
>
> And, surely, you know that if they could bring you some medical testimony to say that to you, they would have either on the video or from somebody live in court or cross-examination of Dr. Booth.
>
> But they can't. So, instead what they do, because they can't get any medical professional to say it, is that a lawyer says it in his closing to you as if that's evidence. . . .
>
> And that's why in order for you to find that something other than the exercise bike caused Mrs. Polett's injuries, you must be provided with medical testimony that something other than the bike caused those injuries. You may not

speculate on what else could have caused Mrs. Polett to be injured.

N.T., 11/18/10 (a.m.), at 105–107. Contrary to the trial court's charge and counsel's representation to the jury, Pennsylvania law does not impose the burden of proving causation on a defendant. *Kennedy*, 816 A.2d at 1159.

Even so, Zimmer and PCI did offer proof in this case, albeit in the form of establishing Mrs. Polett's comparative negligence and challenging the credibility of her causation theory. Zimmer and PCI established that Mrs. Polett had rheumatoid arthritis, which necessitated the knee replacements. They presented evidence that Mrs. Polett maintained an active post-operative lifestyle that included physical therapy with resistive weights and travel. They established that Mrs. Polett fell several times, which resulted in a fractured patella and surgery. They demonstrated that, because Mrs. Polett did not wear the leg brace properly, the repair of the patellar fracture failed, resulting in a second surgery. Moreover, Zimmer and PCI presented evidence that the repaired tendon ruptured again and two allografts eventually failed as a result of Mrs. Polett's rheumatoid arthritis.

The evidence presented by Zimmer and PCI through cross-examination of Mrs. Polett and Dr. Booth, as well as through opposing expert testimony, was not designed to prove specifically that Mrs. Polett's injuries came from some other source. Rather, it was designed to show that Mrs. Polett could not demonstrate the causal connection required to show that her injuries were related to riding the exercise bike or walking on the treadmill. *Kennedy*, 816 A.2d at 1159. Contrary to Mrs. Polett's argument, Zimmer and PCI did not try to link Mrs. Polett's injuries to speculative causes by throwing any theory against the wall to see if it stuck. Rather, they properly challenged the sufficiency of Mrs. Polett's evidence by demonstrating the lack of a causal connection between the exercise machines and her injuries. In other words, Zimmer and PCI's use of Mrs. Polett's medical history and her admissions regarding the post-operative activities she engaged in had the cumulative effect of demonstrating her comparative negligence and undermining her credibility as to the cause of her injuries. *Id.*

Based on the foregoing, therefore, we conclude that the trial court's causation charge was erroneous as a matter of law. The isolated charge palpably misled the jury into believing that Zimmer and PCI were required to present medical evidence that something other than the exercise bike caused Mrs. Polett's injury. The law does not support shifting the burden of proof to the defense under the circumstances of this case. Because of this error, Zimmer and PCI are entitled to a new trial.

In issue four, Zimmer and PCI claim they are entitled to a new trial because the trial court erred in allowing the causation testimony of Dr. Booth for two reasons. First, Zimmer and PCI argue that Dr. Booth was not disclosed as a testifying expert prior to trial. Second, they contend that Dr. Booth could not offer his opinions with sufficient certainty. Zimmer and PCI's Brief at 22.

 Our standard of review for evidentiary rulings is a narrow one:

When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it

must have been harmful or prejudicial to the complaining party.

The admissibility of expert testimony is soundly committed to the discretion of the trial court, and the trial court's decision will not be overruled absent a clear abuse of discretion.

*Hatwood v. Hospital of the University of Pennsylvania,* 55 A.3d 1229, 1239 (Pa.Super.2012), *appeal denied,* —— Pa. ——, 65 A.3d 414 (2013) (internal citations and quotation marks omitted).[3]

■ Zimmer and PCI initially argue the trial court erred in allowing Dr. Booth's causation testimony because Mrs. Polett did not disclose him as an expert witness pursuant to Pennsylvania Rule of Civil Procedure ("Pa.R.C.P.") 4003.5 (**Discovery of Expert Testimony. Trial Preparation Material**), and Mrs. Polett never produced an expert report from him. Zimmer and PCI's Brief at 23. Contrarily, Mrs. Polett argues that Dr. Booth's testimony is exempt from the expert disclosure requirement because he is her treating physician, and he did not acquire his opinions in anticipation of litigation. Mrs. Polett's Brief at 23–24 (citing, *inter alia, Kurian v. Anisman,* 851 A.2d 152 (Pa.Super.2004)). In rebuttal, Zimmer and PCI rely on *Smith v. Southeastern Pennsylvania Transp. Authority,* 913 A.2d 338 (Pa.Cmwlth.2006), for the proposition that a plaintiff cannot shield an expert by characterizing him as a treating physician. Zimmer and PCI's Brief at 23.

Relying on *Feingold v. Southeastern Pennsylvania Transportation Authority,* 512 Pa. 567, 517 A.2d 1270 (1986), the trial court opined that:

Dr. Booth was not retained in anticipation of litigation. His deposition was taken one and one-half years prior to trial. His treatment and operative notes for all of Mrs. Polett's surgeries were available to Dr. Clark and the defendants' medical team for review and comment. Dr. Booth did not express any opinion about whether any of the parties were negligent. Zimmer and PCI were not unfairly surprised by the medical expert testimony of Dr. Booth.

Trial Court Opinion, 6/10/11, at 22. After careful review of the record, we are constrained to disagree.[4]

Dr. Booth first saw Mrs. Polett on May 31, 2006, "for an evaluation of her knee—knees." N.T. (Booth Deposition), 6/26/09, at 6. Following her bilateral knee surgery on July 27, 2006, Mrs. Polett had a positive post-operative appointment on August 16, 2006. However, Mrs. Polett returned to Dr. Booth sooner than planned, on September 20, 2006. Dr. Booth wrote a progress note for this visit:

The patient returns today having had mild discomfort in her knees after riding on a bicycle. She has slight loss of motion from her prior visit, but no evidence of infection or other serious problem. She does have a mild synovitis for which Relafen and Tylenol with codeine was prescribed.

---

**3.** No one disputes that Mrs. Polett was required to present the expert testimony of a medical doctor to establish a causal connection between her riding the exercise bike and the injury to her knees. Given her pre-existing medical conditions, the "issue is not 'so obvious as to be within the range of experience and comprehension of . . . lay persons.'" *Kurian v. Anisman,* 851 A.2d 152, 155 (Pa.Super.2004) (quoting *Toogood v. Owen J. Rogal*

*D.D.S., P.C.,* 573 Pa. 245, 824 A.2d 1140, 1145 (2003)).

**4.** We consider the trial court's *Feingold* analysis misplaced, as the matter at hand did not involve Mrs. Polett's failure to identify Dr. Booth as a witness. Rather, she failed to identify him specifically as an expert pursuant to Pa.R.C.P. 4003.5, and then she used him as a causation expert at trial.

The patient will remain active and follow-up at her regular appointment.

Trial Exhibit P3. One month later, on October 23, 2006, Mrs. Polett returned, and Dr. Booth wrote another progress note:

The patient returns today with persistent discomfort in both knees. This dates from the time of her exercise bike for video purposes.

Examination today shows several degrees of lost extension in both knees, which I feel is related to her problem. I have recommended a change of anti-inflammatory medication to Cataflam, a concentration on hamstring stretches, and avoidance of weights which the patient has been using along with resistive exercises, despite my encouragement to do otherwise. She is returning from a trip to Vietnam which was clearly stressful and I am hopeful that her symptoms will diminish.

Trial Exhibit P4.

Referring to these office notes, the trial court determined that, "[f]or two years prior to any litigation, Dr. Booth had to evaluate the cause of Mrs. Polett's injuries in order to treat her." Trial Court Opinion, 6/10/11, at 25. However, according to Dr. Booth, he wrote the above reports while acting as Mrs. Polett's treating physician, recording information that she provided. N.T. (Booth Deposition), 6/26/09, at 109, 157, 159, 161, 185.[5] By his own admission, Dr. Booth did not view the videotape until the trial, and he did not investigate the cause of Mrs. Polett's injuries because his sole concern was treating the problem. Id, at 33–34, 42, 140, 142, 158, 177. Thus, he did not undertake any effort to evaluate other causes and form opinions while he served as Mrs. Polett's treating physician. Id, at 42, 140, 142, 157–158, 179. Read in their proper context, therefore, the office notes report only a temporal connection between Mrs. Polett riding the exercise bike and her injuries, not causation opinions personally developed by Dr. Booth in the normal course of treating Mrs. Polett. Accordingly, we disapprove of the trial court's hindsight use of Dr. Booth's deposition and trial testimony to characterize the office notes as causation opinions. Trial Court Opinion, 6/10/11, at 24–26.

The record reveals that Dr. Booth's first causation opinion appeared in the summer of 2008 in the form of finger pointing. Specifically, on June 4, 2008, Dr. Booth wrote an office note in which he opined: "[I]t is the filming company who asked to interview Mrs. Polett with whom the responsibility lies, as well as those who employed them." N.T. (Booth Deposition), 6/26/09, at 107, and Exhibit 6. Notably, Dr. Booth also indicated in the note that Mr. Polett had asked him about executing a tolling agreement, which would extend by six months the limitations period for suing Dr. Booth and his practice. Id. at Exhibit 6. Thus, as of June 4, 2008, Dr. Booth contemporaneously associated Mrs. Polett's injuries with the exercise bike and faced the possibility of litigation.[6] When questioned about the June 4, 2008 office note a year later at his deposition, Dr. Booth confirmed a correlation between his causation opinion and the tolling agreement:

I think this chain of events began with that exercise bike experience. This note

---

**5.** At trial, Dr. Booth reiterated that his comments about the exercise bike were based on what Mrs. Polett told him. N.T., 11/15/10 (p.m.), at 94, 104, 106, 113, and 132.

**6.** Four months after writing the June 4, 2008 office note, Dr. Booth was joined as an additional defendant by writ on October 2, 2008; a joinder complaint was filed on November 12, 2008.

was prompted by Mr. Polett, as it says in the beginning of the note, asking me for a tolling agreement, which I never heard of. Not that I'm a novice in the malpractice wars, but this was something new to me. I was shocked by it, and disappointed that—because I wanted to keep taking care of her. And now we have all got this sword hanging over us that has culminated with today—not culminated, but continues today. And so this is written out of petulance, but I do believe that what I was trying to suggest was that I didn't think that we did anything wrong here.

N.T. (Booth Deposition), 6/26/09, at 102.

Based on the record before us, we conclude that Dr. Booth never reached a pre-anticipation-of-litigation conclusion as to whether Mrs. Polett's riding the exercise bike was a substantial factor in causing her injuries. Dr. Booth's causation opinions arose under a sword of litigation, not during the regular course of his treating Mrs. Polett. Thus, Mrs. Polett could not shield Dr. Booth from the requirements of Rule 4003.5 by characterizing him as a treating physician. *Accord Kurian,* 851 A.2d at 156 ("The fact that [appellant's expert] never came to a pre-anticipation-of-litigation conclusion as to whether [the physician] breached [his] standard of care and whether such a breach was the proximate cause of the harm [the child] suffered is fatal to this claim.").

 In contrast to the trial court's ruling, we further conclude that Mrs. Polett's discovery violation resulted in prejudice to Zimmer and PCI at trial. Zimmer and PCI consistently and aptly describe the prejudice as follows:

Unfortunately, we didn't have the benefit as defendants of an expert report, an expert disclosure, ahead of time to do the sort of analysis and to look at the analysis that an expert would typically perform in a case like this.

\* \* \*

[H]e wasn't disclosed prior to the trial. He wasn't disclosed at least as an expert witness, but he was disclosed as a treating physician.[7]

We don't think the fact that he was a treating physician should have exempted them from the rule requirement because his opinions as to causation, Your Honor, really were not within the normal realm of his treatment regimen for the plaintiff, Mrs. Polett.

As is typical of a treating physician, he wasn't doing the type of rigorous analysis and factual investigation to determine what it is that may have caused the injury. He didn't really dig into all the facts and, in fact, admitted that he was repeating basically what Mrs. Polett told him the first time that he spoke to her or so after the filming and that she claimed that she started to have some pain in the leg about a month after the filming.

As your Honor knows, there was evidence that other activities had been undertaken in that same period of time, but he seemed to be repeating what she said rather than doing an independent examination of all the other potential causes, especially as it became more attenuated going out in time and there were other activities, trips abroad, trips to Vietnam, exercise things and the tendon ruptures, all the other things that happened afterwards, tiny, tiny, tiny

---

7. The trial court understood on the first morning of trial that Dr. Booth was being called as a treating physician. N.T., 11/15/10 (a.m.), at 9. Dr. Booth also acknowledged that he was called as Mrs. Polett's treating physician and not hired as an expert. N.T., 11/15/10 (p.m.), at 132.

things, three minutes on the [bicycle], and a whole long history of other activities. We believe we were entitled to an expert report going through an analysis of all that. . . .

\*　　\*　　\*

He was permitted to testify beyond his role as a treating physician. He was permitted to give expert testimony without a report to rely on, without the ability to use that report to cross-examine him.

\*　　\*　　\*

[H]e wasn't being proffered before the deposition as an expert. Your Honor can see that he was being deposed as a treating physician. When you know someone is going to be an expert witness on a critical point—that's why the courts require in lieu of deposition—you want the ability to look and see what the analysis is and what all—as you know, Your Honor, the rule specifically says, all the factors the person is going to rely on in coming up with that particular opinion that they are addressing.

This guy was a treating doc. This guy was a guy that was worried about her treatment, her prognosis. He didn't do that type of analysis beforehand that we were entitled to see. What was his thinking on all these issues related to causation? Did he eliminate all the alternative potential causes? What did he do in terms of deciding which of these causes were the most important? How did he balance them out? A lot of that, Your Honor, we would have gotten and been entitled to in a report in writing.

N.T., 3/26/11, at 8, 13–14, 26, 62–63.

Had Dr. Booth been properly designated as a testifying expert, he would have been required to provide an expert report and/or detail interrogatory answers, which, in turn, would have provided the requisite roadmap for his trial testimony on causation, including his "opinions" on causation, how he reached those "opinions," and what, if anything, he relied upon in doing so. Pa.R.C.P. 4003.5(a)(1)(b). [Zimmer and PCI] received none of this information and, thus, their ability to cross-examine Dr. Booth at trial was severely compromised.

The trial court also reasoned that [Zimmer and PCI] were not prejudiced because they were able to explore certain positions that Dr. Booth held during his deposition. However, by not knowing that Dr. Booth was going to serve as a testifying expert and by not receiving an expert report, [Zimmer and PCI] were only able to depose Dr. Booth as the fact witness that he was at that time. [Zimmer and PCI] had no notice of the need to prepare for and depose Dr. Booth as if he were a proffered testifying expert. Thus, [at] the time of trial, [Zimmer and PCI] had no expert report, had no expert interrogatory answers, and were left without a full sense of Dr. Booth's causation analysis.

Zimmer and PCI's Brief at 26 (citing *Kurian*, 851 A.2d at 162).

In sum, our review of the record indicates that Mrs. Polett violated Pa.R.C.P. 4003.5 by not identifying Dr. Booth as an expert prior to trial and that Zimmer and PCI were prejudiced by this violation. Thus, we conclude that the trial court erred in denying Zimmer and PCI's motion *in limine* regarding Dr. Booth's causation testimony. This error is an additional basis for a new trial.

 Zimmer and PCI further argue the trial court should have precluded Dr. Booth's causation testimony because he lacked sufficient certainty to render an expert opinion. Zimmer and PCI's Brief at 27. Upon review, we acknowledge some

support in the record for Zimmer and PCI's position about the quality of Dr. Booth's testimony, but we conclude that this particular argument does not warrant a new trial in this case.

In June 2009, Dr. Booth offered opinions about causation while being led through a deposition by Mrs. Polett's counsel. At the same time, Dr. Booth admitted that he did not participate in the exercise portion of the videotaping, and he had not viewed the entire video of Mrs. Polett riding on the exercise bike. N.T. (Booth Deposition), 6/26/09, at 32–36. Moreover, he repeatedly explained that he did not know what happened on the day of videotaping, that he was unaware of other activities Mrs. Polett engaged in between August 23, 2006 and September 20, 2006, and that he did not know or investigate what caused her injuries. *Id*, at 35–36, 42, 47–49, 59–61, 66–67, 86–87, 112, 142, 144–145, 156–158, 164–166, 178–179. Consequently, at his deposition Dr. Booth could not testify to a reasonable degree of medical certainty. *Id*, at 179–180.

At the end of his trial testimony, Dr. Booth testified that his opinions were "held within a reasonable degree of medical certainty." N.T., 11/15/10 (p.m.), at 148. Yet, the record demonstrates that Dr. Booth did not consider all of the information available to provide a complete picture of Mrs. Polett's activities, the circumstances surrounding her injuries, and the factors potentially contributing to those injuries. For example, Dr. Booth did not know the scope of Mrs. Polett's physical therapy workouts between August 23, 2006, and September 20, 2006. N.T., 11/15/10 (p.m.), at 71–72, 95. He was not aware of her walks on the beach or the extent of her traveling. *Id*, at 100–102. Dr. Booth was not informed about a painful "pop" Mrs. Polett felt in church one day when she was not wearing the brace.

*Id*, at 121. He did not know Mrs. Polett was not wearing the brace as ordered. *Id*, at 122–123.

 Notwithstanding the equivocal nature of Dr. Booth's testimony, we decline to provide relief on this particular issue because Zimmer and PCI's argument implicates the weight of Dr. Booth's testimony.

The trial judge's authority to award a new trial on weight-of-the-evidence grounds is narrowly circumscribed on account of the principle that credibility questions are exclusively for the fact finder. The matter is couched as discretionary in the trial court, with its role in the assessment being afforded primacy in view of its substantially closer vantage to the evidentiary presentation as compared to that of an appellate court. Relief is available in an appellate court only if it can be said that the trial court acted capriciously or palpably abused its discretion.

*Hatwood*, 55 A.3d at 1238 (quoting *Com., Dept. of General Services v. U.S. Mineral Products Co.*, 598 Pa. 331, 956 A.2d 967, 973–974 (2008) (footnote and citations omitted)).

Upon careful review of the record, we cannot say the qualitative totality of Dr. Booth's testimony did not support Mrs. Polett's theory that riding the exercise bike was a substantial factor in causing her injuries. There was conflicting causation evidence presented at trial, which was properly presented to the fact-finder. The jury was free to believe Dr. Booth's testimony that riding the exercise bike caused the synovitis, which caused a loss of motion and started a chain of events, including falls, a patellar fracture, and ruptured tendons. Thus, we cannot conclude the trial court abused its discretion in denying Zimmer and PCI a new trial on their

weight-based argument about Dr. Booth's testimony.

■ In their fifth issue, Zimmer and PCI argue they are entitled to a new trial because the trial court erred in granting Mrs. Polett's motion *in limine* to preclude Zimmer and PCI from using the tolling agreement, which extended the statute of limitations for the Poletts to sue Dr. Booth. Zimmer and PCI's Brief at 41. Zimmer and PCI sought to impeach Dr. Booth's credibility with the tolling agreement:

> Dr. Booth is their witness on the causation issue. He's a critical witness to them. When he first gave his opinion in his office note regarding some kind of causal connection between the biking and Mrs. Polett's injuries, it was after he'd got the request from the Poletts for the tolling agreement.
>
> \* \* \*
>
> When Dr. Booth gave his opinion at his deposition, he was a defendant in the case and the subject of a tolling agreement with the Poletts.
>
> So to the extent the jury is going to be asked to assess Dr. Booth's credibility in the case, which, of course, they will when he's offering a causation opinion, they will need to decide whether the Poletts had threatened to sue him, he signed the tolling agreement, and he was actually a defendant in the case could in any way influence his opinion regarding a causal connection between the biking, which he viewed as being PCI and Zimmer's fault, and her actual ultimate injuries.

N.T., 11/15/10 (a.m.), at 32–33; *see also* Zimmer and PCI's Brief at 41 ("[W]hen Dr. Booth first gave his purported causation testimony, he had entered into the Tolling Agreement with [the Poletts] and was a defendant in this action. Thus, he had an incentive to place responsibility on [Zimmer and PCI], and away from himself and Mrs. Polett."). Contrarily, Mrs. Polett contends, "the agreement was irrelevant to any disputed issue, especially as the parties had stipulated that Dr. Booth bore no responsibility for Mrs. Polett's injuries." Mrs. Polett's Brief at 27–28.

■ Generally, the credibility of a witness may be impeached by any evidence relevant to that issue. Pa.R.E. 607(b); *American Future Systems, Inc. v. BBB*, 872 A.2d 1202, 1214 (Pa.Super.2005). Specifically, "[i]mpeachment of an expert witness by demonstrating partiality is permissible." *J.S. v. Whetzel*, 860 A.2d 1112, 1120 (Pa.Super.2004) (citing *Smith v. Celotex Corp.*, 387 Pa.Super. 340, 564 A.2d 209, 214 (1989)). "The methods that may be used to impeach credibility are subject to Pa.R.E. 401, which defines relevant evidence." Pa.R.E. 607 *Comment.* Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa. R.E. 401. "Impeachment evidence is also subject to Pa.R.E. 403, which provides that relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice." Pa.R.E. 607 *Comment.*

As Zimmer and PCI disclose, Pennsylvania courts have not addressed the use of a tolling agreement for impeachment purposes. However, they submit both our Supreme Court and this Court have held that analogous agreements may be used to show a witness' bias or prejudice. Zimmer and PCI's Brief at 42–43. In support of their position, Zimmer and PCI cite: *Hatfield v. Cont'l Imports, Inc.*, 530 Pa. 551, 610 A.2d 446 (1992) (indemnification agreement between co-defendants); *Profit–Sharing Blue Stamp Co. v. Urban Rede-*

velopment Authority of Pittsburgh, 429 Pa. 396, 241 A.2d 116 (1968) (reimbursement agreement between owner of condemned building and city agency); Coward v. Owens–Corning Fiberglas Corp., 729 A.2d 614 (Pa.Super.1999) (compensation agreement between expert witness and party calling him); and Smith v. Celotex Corp., 387 Pa.Super. 340, 564 A.2d 209 (1989) (compensation agreement and ongoing business relationship between expert witness and other asbestos manufacturers).

Given the lack of specific authority regarding tolling agreements in our Commonwealth, we consider the federal district court decision cited by Zimmer and PCI for guidance in resolving this issue. In AMEC Civil, LLC v. DMJM Harris, Inc., 2008 WL 8171059 (D.N.J.2008), the district court addressed whether a joint defense agreement was discoverable as relevant to show bias for impeachment purposes. The plaintiff served the defendants "with a request for production of tolling agreements, settlement agreements, or joint defense agreements that the parties entered into with each other and non-party NJDOT [New Jersey Department of Transportation]." Id. at *1. The court recognized that impeachment evidence is a "classic example of the type of evidence that should be discoverable in litigation." Id. at *2 (citing Jeld–Wen, Inc. v. Nebula Glasslam Int'l, Inc., 2008 WL 756455, at *9 (S.D.Fla.2008)). It further reasoned that "[b]ecause settlement or tolling agreements can be used as impeachment evidence, such documents are relevant to the [plaintiff's] claim." Id. Accordingly, the court held that the defendants had to produce "Paragraph 4(G) on pages 16–17 of the Agreement, and any other portions which constitute tolling provisions. The rest of the Agreement need not be produced." Id. at *4.

Here, the trial court explained that:

Dr. Booth's office notes, written contemporaneously with his patient's visits in September and October, 2006, and written two years prior to the existence of the tolling agreement and prior to the statute of limitations, formed the basis for the Trial Court's ruling on the Motion in Limine.

\* \* \*

[Zimmer and PCI] were unable to satisfactorily explain or justify their challenge of "slanted testimony" from Dr. Booth. They have baldly proclaimed that [he] had an "incentive to lie" about causation, with "flimsy and speculative testimony".

\* \* \*

In none of the post-trial submissions have Zimmer and PCI pointed to any place in the entire record where Dr. Booth placed responsibility on others, particularly [Zimmer and PCI].

Trial Court Opinion, 6/10/11, at 31, 32 (internal citations omitted). Upon review of the record at hand and guided by Pennsylvania case law on analogous agreements and the rationale of AMEC Civil, LLC, we conclude the trial court's reasoning and conclusions are untenable.

The issue of causation was determinative of Mrs. Polett's case. Dr. Booth's testimony on causation and on what influenced his opinions was, therefore, relevant. The jury alone was responsible for assessing Dr. Booth's credibility, which assessment would include a determination of his objectivity. As discussed above, Dr. Booth personally linked the exercise bike and Mrs. Polett's injuries for the first time in June 2008, when Mr. Polett approached him about a tolling agreement. N.T. (Booth Deposition), 6/29/09, at Exhibit 6. Contrary to the trial court's finding, Dr. Booth identified Zimmer and PCI as the parties re-

sponsible for Mrs. Polett's injuries. *Id.* at 107 and Exhibit 6. Furthermore, Dr. Booth admitted that he wanted to keep treating Mrs. Polett, despite the "sword of litigation" over his head. *Id.* at 102. In light of Dr. Booth's statements, Zimmer and PCI should have been permitted to demonstrate his partiality as a doctor who faced the possibility of litigation; who did not think he was at fault; who did not want to alienate his patient; and who squarely placed responsibility for Mrs. Polett's injuries on "the filming company who asked to interview Mrs. Polett . . ., as well as those who employed them." *Id.* at Exhibit 6.

Applying the safeguard of Pa.R.E. 403, we further conclude that the probative value of the tolling agreement outweighed the danger of unfair prejudice. When questioned about the tolling agreement, Dr. Booth could explain to the jury that the Poletts did not sue him, that the parties stipulated to his lack of responsibility, that the tolling agreement was not in effect as of the trial, and that the threat of litigation did not influence his opinions. Thus, provided on one hand with evidence that Dr. Booth's causation opinions were tied to the tolling agreement, his desire to continue treating Mrs. Polett, and his finger pointing, and on the other hand with Dr. Booth's defense to the inference that his testimony was partial, the jury could then fully assess the quality of Dr. Booth's testimony.

Based on the foregoing, we conclude the trial court erred in granting Mrs. Polett's motion *in limine* to preclude Zimmer and PCI's use of the tolling agreement to impeach Dr. Booth. Because of this additional error, Zimmer and Polett are entitled to a new trial.

Lastly, we address Zimmer and PCI's request for remittitur. Zimmer and PCI's Brief at 62. Given our disposition of the issues requesting a new trial in Zimmer and PCI's favor, the remittitur issue is moot. Therefore, we will not discuss its merits, as doing so would result in dicta and/or an advisory decision. *See Phila. Entm't & Dev. Partners, L.P. v. City of Phila.*, 594 Pa. 468, 937 A.2d 385, 392 (2007) ("[C]ourts should not give answers to academic questions or render advisory opinions or make decisions based on assertions as to hypothetical events that might occur in the future."); *Braun v. Wal–Mart Stores, Inc.*, 24 A.3d 875 (Pa.Super.2011), *appeal granted in part*, 616 Pa. 354, 47 A.3d 1174 (2012) (declining to render an advisory opinion on the merits of a 370% multiplier where trial court, which inadvertently double-counted factors in granting an enhancement, may not necessarily impose the same 3.7 multiplier on remand).

In sum, we conclude that the trial court erred (a) in instructing the jury on causation; (b) in denying Zimmer and PCI's motion *in limine* to preclude the causation testimony of Dr. Booth; and (c) in granting Mrs. Polett's motion *in limine* to preclude use of the tolling agreement to impeach Dr. Booth. Accordingly, we vacate the entry of judgment in favor of Mrs. Polett and her husband and remand for a new trial.

Judgment vacated and case remanded for a new trial. Jurisdiction relinquished.

DONOHUE, J. and LAZARUS, J. Concur in the Result.

WECHT, J. files a Dissenting Opinion which is joined by FORD ELLIOTT, P.J.E.

## DISSENTING OPINION BY WECHT, J.

Following careful review, I am unable to join the learned majority's decision, which vacates the lower court's judgment and

remands this case for a new trial. Accordingly, I respectfully dissent.

The majority aptly summarizes the history of the case. Maj. Op. at 209–10. I need not repeat that history here.

Appellants' first two issues relate to their motion for JNOV. I join the majority in its disposition of those issues.[1]

The third issue raised by Appellants relates to the trial judge's jury instructions. Appellees assert that the issue is waived. I join the majority in concluding that the issue is not waived. Yet, I disagree with the majority's determination that the causation instruction was fatally infirm. As I explain below, I would decline Appellants' invitation to mandate a new trial by reason of the trial court's jury charge.

Appellants' fourth issue challenges Dr. Booth's expert testimony on causation. I join the majority in finding that the expert testified with sufficient certainty. However, the majority finds reversible error in the trial court's refusal to bar that expert testimony for violation of Pa.R.C.P. 4003.5's disclosure mandate. For the reasons that I detail below, I differ with the majority's disposition of this issue.

Appellants' fifth issue relates to the tolling agreement executed between Appellees and Dr. Booth in his capacity as Mrs. Polett's treating physician. I would affirm the trial court's decision to exclude the agreement from the trial evidence.

By virtue of these holdings, I would reach Appellants' sixth issue, wherein Appellants challenge the denial of their request for remittitur. As discussed below, I would affirm the trial court's ruling in this regard as well.

### JNOV

I join the majority's holding that the trial court did not err in denying Appellants' motion for JNOV. I agree that Appellees presented sufficient evidence that the exercise bike was a substantial factor in causing Mrs. Polett's injuries. I also join in affirming the trial court's ruling that the general risk of harm from use of the exercise bike was reasonably foreseeable to Appellants. Maj. Op. at 211–14.

### Jury Instructions

I agree with the majority that Appellants' challenge to the causation jury instruction is not waived. *See* Maj. Op. at 214–16. However, I disagree with the majority's treatment of the merits of that challenge.

In the context of jury instructions, we will grant a new trial only if the charge, viewed in its entirety, was "unclear, inadequate, or tended to mislead or confuse the jury." *McSorley v. Deger*, 905 A.2d 524, 532 (Pa.Super.2006). It is clear beyond peradventure that we are not free to view the challenged instruction outside the context of the entirety of the charge. *Id.* We also are bound to remember that the trial judge enjoys vast discretion in her choice of language, so long as the charge conveys the appropriate law. *Id.* Moreover, we do not reverse a trial court for "isolated inaccuracies" in the jury charge. *Butler v. Kiwi, S.A.*, 412 Pa.Super. 591, 604 A.2d 270, 273 (1992).

Causation was contested at this trial, with both parties offering expert testimony. At the charging conference, Appellants' counsel agreed to an instruction that would state that the jury could not speculate on any fact. N.T., 2/18/2010 (a.m.), at 44–45. Appellees' counsel, however, re-

---

1. I follow the majority's reordering of Appel-

lants' six issues. Maj. Op. at 210–11.

quested a more detailed speculation instruction because Appellants' expert had not testified to a cause for Mrs. Polett's injuries other than the exercise bike. N.T., 2/18/2010 (a.m.), at 46. Appellees' counsel was concerned that Appellants' counsel would argue in closing that other events caused the injuries despite the fact that there was no causation evidence specifically supporting such a theory. N.T., 2/18/2010 (a.m.), at 46–47. Following a discussion of the proposed speculation charge, the trial judge declined to give the instruction. N.T., 2/18/2010 (a.m.), at 49. Appellees' counsel again raised the concern that Appellants might argue that there were other causes, whereupon the trial judge decided to take the issue under advisement, assertedly in order to allow review of the issue after closing arguments. N.T., 2/18/2010 (a.m.), at 51.[2] Due to timing issues, Appellees' counsel suggested that the court charge the jury prior to closing arguments. Appellants' counsel concurred. N.T., 2/18/2010 (a.m.), at 52–53.

The trial court agreed, and then gave its charge, including instructions concerning

the burden of proof of each party with respect to claims asserting Appellants' negligence and Mrs. Polett's comparative negligence. N.T., 2/18/2010 (a.m.), at 73–77. The court did not give an instruction on speculation. After a lunch recess, a different attorney made the closing argument for Appellants.[3] Following (and in view of) that argument, the trial judge determined that she did in fact need to give an instruction on speculation. N.T., 2/18/2010 (p.m.), at 104. The judge instructed the jury that it needed medical testimony to find that something other than the bike caused Mrs. Polett's injuries, and that the jury could not speculate as to other causes. N.T., 2/18/2010 (p.m.), at 105. When viewed in developed context (as our law requires), although this instruction came later in time, it constituted no more than a warning that the jury must not speculate as to the causes of Mrs. Polett's injuries, but instead should rely solely upon the evidence presented.

We have observed:

[A] jury of laypersons generally lacks the knowledge to determine the factual

---

2. Appellees' counsel argued that a speculation charge should be given because Appellants' counsel should not be permitted to argue that something other than the bike caused Mrs. Polett's synovitis, in view of the fact that Appellants' expert testified that the bike was the cause of that condition. Appellees' counsel made clear that he was not requesting an instruction tantamount to a directed verdict on causation, nor one that shifted the burden. N.T., 2/18/2010 (a.m.), at 45–47. After hearing from both sides, the trial judge said, "So I'm not going to read the [speculation] charge as given." N.T., 2/18/2010 (a.m.), at 49.

Appellees' counsel then inquired whether Appellants could argue that there was some other cause. The court agreed that Appellants could not do so. Significantly, Appellants' counsel said, "They're not going to." N.T., 2/18/2010 (a.m.), at 49.

After continued discussion, the trial judge said, "If there's an issue, then I'm going to

hold this under advisement.... And let's see how the closings go for both sides.... So let's see how that goes." N.T., 2/18/2010 (a.m.), at 51.

3. From the transcript, it appears that the attorney who made Appellants' closing argument was not present at the charging conference. While no one noted that lawyer's absence, there is no record of him speaking during the charging conference. Later, after Appellants' closing, the judge indicated that she had thought that counsel who participated in the charge conference for Appellants would convey the judge's warning about speculation to his colleague, N.T., 2/18/2010 (p.m.), at 104. This also suggests that the lawyer who closed for Appellants was not present at the charging conference. Representations made at oral argument *en banc* confirmed this.

issues of medical causation.... In such cases, the cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion.... Without experts we feel that the jury could have no basis other than conjecture, surmise or speculation upon which to consider causation. *Grossman v. Barke,* 868 A.2d 561, 567 (Pa.Super.2005) (internal citations and quotation marks omitted). Appellees offered expert testimony on the medical cause of Mrs. Polett's injuries. Appellants countered that, notwithstanding this expert testimony, Appellees failed to meet their burden of proof. Appellants argued that Appellees demonstrated insufficient causal connection between Appellants' actions and Mrs. Polett's injuries. Appellants used Mrs. Polett's other activities to undermine her expert's testimony on causation. Each of these defense tactics was proper. Conversely, Appellants were not free to rebut Appellees' evidence of causation with mere speculation.

The majority holds that the trial court's speculation instruction improperly shifted the burden of proof to Appellants. The majority characterizes that instruction as temporally "isolated" from the rest of the court's instructions, and concludes that the isolation "improperly focused the jury's attention" on what the majority deems an incorrect burden of proof. Maj. Op. at 217.

The majority's holding itself is isolated from the full trial context. First, it bears noting that the lower court charged the jury on the burden of proof thoroughly, as follows:

In a civil case such as this the plaintiff has the burden of proving those contentions which entitle them to relief. When a party has the burden of proof on a particular issue, the party's contention on that issue must be established by a fair preponderance of the evidence. The evidence establishes a contention by a preponderance of the evidence if you are persuaded that it is more probably accurate and true than not.

So think of a balance scale, and that's the kind of scale with a pan on each side. Okay? On one side of the scale place all of the evidence that you find favorable to the plaintiffs. On the other side, place all of the evidence that you find favorable to the defendants. If after considering the comparable weight of the evidence you feel that the scales tip ever so slightly or to the slightest degree in favor of the plaintiffs, your verdict must be for the plaintiffs. If the scales tip in favor of the defendants or if they're equally balanced, then your verdict must be for the defendants.

In this case Margo and Dan Polett have the burden of proving that the defendants were negligent and that their negligence was a factual cause in bringing about the damages claimed. If after considering all of the evidence you feel persuaded that these propositions are more probably true than not, then your verdict must be for the plaintiffs. Otherwise, your verdict must be for the defendants, PCI and Zimmer.

\* \* \*

The defendants claim that the plaintiff was negligent and that the negligence was a substantial factor causing the plaintiff's injury. The burden is not on the plaintiff to prove her freedom from negligence and, that is, she does not have to prove that she was not negligent. The defendants have the burden of proof by a fair preponderance of the evidence that the plaintiff was negligent and that the plaintiff's negligence was a substantial factor of her injury.

You must decide whether defendants have proven that the plaintiff under all

the circumstances failed to use reasonable care for her own protection.

N.T., 11/18/10 (p.m.), at 73–74, 76–77. This instruction provided an accurate statement of law. The majority does not suggest otherwise. I am unconvinced that the subsequent short instruction on speculation, considered in the context of the entire trial record—and particularly the colloquy at the charge conference, the closing arguments of Appellants' counsel, and the court's longer and more detailed instructions on burden of proof—impermissibly shifted that burden.

Indeed, even if the additional instruction fairly could be construed to suggest some shift in the burden, this would not demand vacatur of judgment and remand for a new trial. We cannot view the speculation instruction outside the context of the entire charge, which clearly articulated the burdens of proof. Nor will we reverse on the basis of "isolated inaccuracies" in the charge. *See Butler, supra.* We do not demand a perfect or immaculate instruction, on pain of vacatur. The cases are legion. *See, e.g., Cooper ex rel. Cooper v. Lankenau Hosp.,* 616 Pa. 550, 51 A.3d 183, 187 (2012) ("In reviewing a challenge to a jury instruction, the entire charge is considered, as opposed to merely discrete portions thereof.... Trial courts are given latitude and discretion in phrasing instructions and are free to use their own expressions so long as the law is clearly and accurately presented to the jury."); *Boutte v. Seitchik,* 719 A.2d 319, 324–25 (Pa.Super.1998) ("A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission which amounts to fundamental error. A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental."); *Havasy v. Resnick,* 415

Pa.Super. 480, 609 A.2d 1326, 1335 (1992) ("The trial court has wide latitude in formulating its charge so long as it clearly and adequately covers the law pertaining to the issues raised by the evidence.... An isolated inaccuracy in an otherwise accurate charge is not a proper basis for reversal.")

I acknowledge the majority's conclusion that Appellants' closing argument did not attempt to link speculative causes to Mrs. Polett's injuries. The majority finds that Appellants' closing argument challenged merely the sufficiency of the evidence and aimed properly to demonstrate Mrs. Polett's comparative negligence and to comment on her credibility. Maj. Op. at 218. I arrive at a different conclusion. In my view, Appellants' closing argument went beyond a mere demonstration of insufficient causal connection and a mere challenge to the adequacy of Appellees' evidence. In essence, Appellants' closing argument raised alternative theories of causation. N.T., 2/18/2010 (p.m.), at 85–101. Those theories must be based upon trial evidence. There was no such basis here. The trial court's decision to retain the proposed speculation instruction under advisement was vindicated when Appellants chose to venture into this terrain in closing. Thereupon, the supplemental instruction was restored to viability. A litigant may not "simply throw any theory against a wall and see if it sticks." *Kennedy v. Sell,* 816 A.2d 1153, 1159 (Pa.Super.2003). Given Appellants' closing argument and the broad deference we afford trial courts in charging juries, I would find no error in the court's speculation instruction.

Appellants raise additional issues related to the jury charge regarding the use of "substantial factor" versus "factual cause," the multiple sufficient cause instruction,

and the "egg shell skull" instruction. Appellants' Brief at 50–55. The majority does not reach these challenges to the jury instructions, because it remands on the basis of the speculation instruction. Having parted ways with the majority on the latter, I would perforce reach these additional challenges. I agree with the trial court that these instructions were appropriate statements of the law, were properly calibrated to the issues of the case, and were not misleading for the jury. Trial Court Memorandum and Order ("T.C.M."), 6/10/2011, at 41–46. I would affirm.

### Dr. Booth's Testimony

Appellants next challenge the trial court's admission of Dr. Booth's causation testimony. Appellants argue that Dr. Booth's testimony lacked sufficient certainty. I agree with the majority that the trial court did not abuse its discretion in denying a new trial on this issue. However, I disagree with the majority's decision that Dr. Booth's testimony should have been precluded because he was not disclosed as an expert witness prior to trial.

We reverse a trial court's decision to admit evidence only when there has been a clear abuse of discretion or an error of law. *Katz v. St. Mary Hospital*, 816 A.2d 1125, 1127 (Pa.Super.2003). Appellants allege a violation of Rule 4003.5. Appellant's Brief at 23–27. Rule 4003.5 permits a trial court to exclude an expert witness whose identity is not disclosed by the party upon whom interrogatories have been propounded requesting such information. Pa.R.C.P. 4003.5(a), (b). The facts known to the expert and opinions developed in anticipa-

tion of litigation also are discoverable under this rule. Pa.R.C.P. 4003.5(a).

Our Supreme Court has held that, when expert opinions are not developed in anticipation of litigation, Rule 4003.5 does not apply. *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525, 532 (1995). In *Miller,* there was an objection to the coroner testifying about time of death, because that testimony required an expert. *Id.* at 527. The coroner had been identified as a witness, but not as an expert witness. *Id.* at 530. Because the coroner had not developed his opinion as to time of death in anticipation of litigation, the Court held that Rule 4003.5 was not violated. *Id.* at 531–32. We have, of course, adhered faithfully to *Miller,* holding that expert testimony is admissible without prior disclosure when the expert opinions were not developed in anticipation of litigation. *See, e.g., Jahanshahi v. Centura Development Co., Inc.,* 816 A.2d 1179, 1185 (Pa.Super.2003) (expert testimony on lost profits admissible where opinion developed in anticipation of opening business, not litigation); *Katz,* 816 A.2d at 1127–28 (Rule 4003.5 did not apply where treating physician developed opinions during treatment, not in anticipation of litigation).[4]

Our cases pivot on the point in time at which the witness forms his or her opinions. The question before us is: When did Mrs. Polett's treating physician, Dr. Booth, develop his opinion as to the cause of her injuries? Based upon three notes in Mrs. Polett's file, the trial court determined that Dr. Booth's opinion (to wit, that the bike caused Mrs. Polett's synovitis) was developed prior to the time that Dr. Booth

---

**4.** *Compare Kurian ex rel. Kurian v. Anisman,* 851 A.2d 152, 154–56 (Pa.Super.2004) (treating physician not disclosed as expert until after defendants moved for summary judgment; because treating physician did not form his opinions on causation prior to antici-

pation of litigation, plaintiff was required to disclose him timely as expert witness). In the case before us, because Dr. Booth reached his causation opinion prior to anticipation of litigation, Appellees were not required to disclose him as an expert.

became aware of any anticipated litigation. T.C.M. at 24–25.

I agree with the majority that the third office note was written after Dr. Booth was approached by Appellees with a proposed tolling agreement. Maj. Op. at 220–21. Therefore, I agree that the third note must have been made with some anticipation of litigation. However, the majority further determines that Dr. Booth formed no causation opinion prior to writing that third note because "his sole concern" was treatment, not etiology. Maj. Op. at 220. After reviewing Dr. Booth's testimony, I disagree.

Dr. Booth's deposition testimony indicates that he reached a causation opinion prior to litigation. Dr. Booth testified that, as of a September 20, 2006 office visit,[5] he believed that Mrs. Polett's knees were swollen due to the exercise bike. N.T. (Booth Deposition), 6/26/2009, at 45. Dr. Booth affirmed that the bike precipitated the events that followed with Mrs. Polett's knees, stating "that's when her difficulties began" and calling it "the watershed moment." Id, at 47, 49–50. He testified that, as of the October 23, 2006 office visit, the bike was the most likely explanation of the synovitis. Id, at 52–53, 105. The second note was written on October 23, before any discussion of a tolling agreement. Dr. Booth clearly set forth in his deposition that he believed the bike started the chain reaction that led to Mrs. Polett's condition. Id, at 177 ("[S]he ove-

rexercised … and that began swelling, then pain, then instability, then the fracture, then the two failed repairs, then the two failed allografts that get us to where we are now.") While Dr. Booth acknowledged that there could be other factors, he explained that the bike was the most likely cause. Id, at 180.

Dr. Booth's trial testimony was consistent with his deposition. Dr. Booth testified that, as of October 23, 2006, he formed his opinion that riding the bike caused Mrs. Polett's synovitis. N.T., 11/15/2010 (p.m.), at 11.[6] Dr. Booth explained that the synovitis was the first link in a chain of events that led to the failure of the knee replacement. N.T., 11/15/2010 (p.m.), at 13–14, 19, 24–25. Dr. Booth admitted that his information about Mrs. Polett riding the bike came from Mrs. Polett herself. N.T., 11/15/2010 (p.m.), at 94, 104. However, Dr. Booth maintained that he made the connection between the bike and the synovitis at the time that he wrote the note, prior to any anticipation of litigation. N.T., 11/15/2010 (p.m.), at 106. Dr. Booth stated that he was concerned about the cause, because this would indicate whether the inflammation and pain were due to an infection or due to "something mechanical." N.T., 11/15/2010 (p.m.), at 106–07. While this testimony undoubtedly is relevant to Dr. Booth's treatment of Mrs. Polett, it also establishes the timing of the formation of his opinion on causation prior to any anticipation of litigation.[7]

---

**5.** The September 20, 2006 progress note in Mrs. Polett's chart is the first of the three notes referenced.

**6.** The September 20, 2006 progress note makes a connection between the synovitis and the bike. While this corroborates Appellees' view that Dr. Booth had formed an opinion as to the cause of Mrs. Polett's synovitis, Dr. Booth was not specifically asked at trial if he had formed an opinion at that time. N.T., 11/15/10 (p.m.), at 4–5.

**7.** Later, Dr. Booth testified that he was not "trying to scrutinize the cause." N.T., 11/15/2010 (p.m.), at 114. However, from context, it is clear the Dr. Booth was referring specifically to the cause of Mrs. Polett's patellar fracture and to the question of whether that fracture resulted directly from riding the bike or from a fall caused by the synovitis. Whether Dr. Booth's level of inquiry was as rigorous as possible goes to the weight of his testimony, not to its admissibility. That testi-

Further, Appellants have not shown that they were prejudiced by the inclusion of Dr. Booth's testimony. Rule 4003.5's purpose is to prevent surprise. *Miller,* 664 A.2d at 530 n. 3. Here, Appellants participated in Dr. Booth's deposition. That deposition testimony was consistent with Dr. Booth's testimony at trial. I cannot conclude that any prejudice resulted from the court's ruling to admit Dr. Booth's testimony.[8]

Given the deference we are bound to afford the trial court's evidentiary rulings, the lack of resulting prejudice, and the testimony indicating that Dr. Booth reached his conclusions before any anticipation of litigation, I would affirm the trial court and would decline to grant a new trial on this issue.

### Tolling Agreement

Appellants next challenge the trial court's decision to preclude the use of the tolling agreement that Dr. Booth signed with Appellees. Appellants wished to use that agreement to impeach Dr. Booth's credibility. The majority, while acknowledging that there is no direct authority in Pennsylvania on the use of tolling agreements for impeachment, concludes that the agreement is relevant because Dr. Booth did not form a causation opinion until after being approached by Appellees with that tolling agreement. Maj. Op. at 224–26.

I disagree. The trial judge has broad discretion in deciding the admissibility of misleading or confusing evidence. Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or confusion. *Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890, 909 (1995).

Here, the tolling agreement had obvious and patent potential to confuse or mislead the jury. It can hardly be gainsaid that tolling agreements lie outside the realm of an average lay juror's knowledge. Testimony would have to be introduced, almost certainly by an expert witness, to explain what a tolling agreement is and what its purpose would be in this case. There would be manifest danger that such testimony would invade areas protected by attorney-client privilege, as litigation strategy necessarily would come into play. Issues presumably discussed between Appellees and their counsel, such as whom to sue and when to initiate litigation, as well as the reasons for later dissolving the tolling agreement, would have to be excavated, aired, and examined thoroughly so that the jury might be able fully to evaluate the extent to which the agreement might have influenced Dr. Booth's testimony. Perhaps Appellees' counsel would have to be disqualified and new counsel retained. At the least, the case would have been lengthened substantially, and the jury would have been treated to the proverbial trial within a trial.

---

mony certainly and appropriately was challenged on cross-examination and in argument. Weight, of course, is for the jury.

**8.** Relying upon *Kurian, supra* n. 4, Appellants contend that, despite their participation in Dr. Booth's deposition, the failure to identify him as an expert witness was prejudicial "[a]s a matter of law." Appellants' Supplemental Brief at 14. However, *Kurian* held that preclusion of a witness' testimony was a "drastic sanction" and that "prejudice may not be

assumed." 851 A.2d at 162. *Kurian* placed the burden of proving prejudice squarely upon the complaining party. *Id.* In *Kurian,* the physician's expert report differed from his prior statements, which resulted in prejudice. *Id.* Instantly, as shown above, Dr. Booth's opinions and testimony were consistent across his medical notes, his deposition, and his trial testimony. I discern no error in the trial court's determination that no prejudice resulted. *See* T.C.M. at 22–26.

The tolling agreement had little probative value in any event. The agreement was cancelled prior to trial. The parties stipulated prior to trial that Dr. Booth was not negligent. Moreover, my above-stated disagreement with the majority about the timing of the formation of Dr. Booth's causation opinions figures significantly here: as I would hold that Dr. Booth's opinions were developed prior to the anticipation of litigation, the tolling agreement could offer little to no probative value in impeaching Dr. Booth's testimony on causation. Further, Appellants' expert witness agreed that the bike caused Mrs. Polett's synovitis. Therefore, the tolling agreement had limited to no value in the cross-examination of Dr. Booth.

The tolling agreement would have been confusing to the jury, and would have been of limited probative value. I would affirm the trial court's decision to exclude evidence of that agreement.

### Remittitur

Because it remands for a new trial, the majority does not reach Appellants' sixth issue, their request for remittitur. Because I would affirm the trial court on the other issues, I would reach this request. We have held that:

> Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption.

*Rettger v. UPMC Shadyside*, 991 A.2d 915, 932 (Pa.Super.2010) (quoting *Potochnick v. Perry*, 861 A.2d 277, 285 (Pa.Super.2004)). The decision to grant or deny remittitur is within the trial court's sound discretion, and will be overturned only upon a showing of abuse of discretion or error of law. *Id.* We cannot substitute our judgment for that of the factfinder, and we must view the record with consideration of the evidence accepted by the jury. *Smalls v. Pittsburgh–Corning Corp.*, 843 A.2d 410, 414 (Pa.Super.2004).

> In determining whether a jury's award of damages is supported by the evidence, the following factors are taken into account:
>
> 1.) the severity of the injury;
>
> 2.) whether the injury is demonstrated by objective physical evidence or subjective evidence;
>
> 3.) whether the injury is permanent;
>
> 4.) the plaintiff's ability to continue employment;
>
> 5.) disparity between the amount of out of pocket expenses and the amount of the verdict; and
>
> 6.) damages plaintiff requested in his complaint.

*Smalls*, 843 A.2d at 415 (quoting *Stoughton v. Kinzey*, 299 Pa.Super. 499, 445 A.2d 1240, 1242 (1982)).

Appellants argue that the award was excessive, given that Appellees did not request any economic damages (e.g., medical expenses or lost earnings). Appellants contend that Mrs. Polett, though required to use a walker, is able nonetheless to engage in many of the same activities in which she engaged prior to her injuries. Appellants argue that the damages award should shock the conscience, given Mrs. Polett's age and the asserted lack of impact on her daily life. Appellants' Brief at 64–69.

Appellees reply that the record supports the award. Mrs. Polett testified about her pain and about her multiple surgeries. Dr. Booth testified to the surgical procedures, including the tendon allographs (us-

ing cadaver tissue), and the pain and difficulties attendant thereto. Mrs. Polett spoke about her need to use a walker, her constant fear of falling, her multiple falls, and her dependence upon others to assist her with daily activities and to monitor her safety. Mr. Polett also testified about the surgeries and about Mrs. Polett's pain and lack of mobility. As well, Mr. Polett addressed Mrs. Polett's increased dependence on others and her withdrawal from community activities. Appellees' Brief at 52–56.

The trial court found that the jury award was supported by the record, particularly given Mrs. Polett's surgeries, loss of mobility, and the continuing nature of her disability. T.C.M. at 52. *See Gillingham v. Consol Energy, Inc.,* 51 A.3d 841, 862, 864 (Pa.Super.2012) (jury award did not shock conscience where plaintiffs provided comprehensive testimony of pain and suffering endured). The trial court noted also that the jury was able to observe Mrs. Polett pre-injury through the video created by Appellants themselves. *Id.* The trial court found that the record as a whole, including testimony of Dr. Booth, Mrs. Polett, and Appellants' own expert, supported the jury's award. T.C.M. at 53–56.

A fair assessment of the record supports the jury's conclusion that Mrs. Polett's pre-injury activities were curtailed and that she required increased assistance. I would hold that the trial court did not abuse its discretion in denying remittitur and in deferring to the jury's considered judgment.

In sum, I would affirm the trial court. Therefore, I respectfully dissent.