J. A32031/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KELLY MONACO, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY - OF THE | : | |
| COMMONWEALTH SYSTEM OF HIGHER | : | |
| EDUCATION, | : | |
| | : | |
| Appellant | : | No. 499 EDA 2014 |

Appeal from the Judgment Dated July 25, 2013
In the Court of Common Pleas of Philadelphia County
Civil Division No(s).: 120503532

BEFORE: PANELLA, OLSON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED MAY 22, 2015**

Appellant, Temple University – of the Commonwealth System of Higher

Education, appeals from the judgment[1] entered in the Philadelphia County

Court of Common Pleas, in favor of Appellee, Kelly Monaco, following a jury

trial. Appellant argues the trial court erred in denying its motion for a new

trial and/or remittitur in this slip and fall case because: (1) prejudicial error

resulted from various evidentiary rulings; (2) the trial court committed

---

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant purported to appeal from the order denying its post-trial motion. We amend the caption to reflect the appeal properly lies from the judgment entered on July 25, 2013. ***See Levitt v. Patrick***, 976 A.2d 581, 584 n.2 (Pa. Super. 2009).

reversible error in its charge to the jury; and (3) the jury verdict was plainly excessive and exorbitant. We affirm the judgment but correct a patent error in the amount of total damages to Appellee.

The trial court summarized the evidence as follows:

[Appellee, a student at Temple University,] brought the instant premises liability action due to a slip and fall incident that occurred shortly after 12:30 p.m. on a set of steps in front of Ritter Hall on the Philadelphia campus of [Appellant] on June 1, 2010. It had been raining heavily, but [Appellee] waited until the rain had diminished before leaving Ritter Hall with a classmate, Donald Prifti. [Appellee, who was wearing flip-flops,] slipped and fell backward while descending the steps[,] causing a severe ankle fracture which required the implantation of surgical hardware by an orthopedic surgeon.

[Appellee] presented evidence at trial which the jury[,] as the fact finder[,] found established the liability of [Appellant]. The stairs outside of Ritter Hall lacked tread for traction; were negligently constructed with respect to slope; had side handrails that were too short; and lacked a center handrail for [Appellee] to grasp when descending the steps. [Appellee] presented the expert testimony of Walter E. Green, A1A, who opined that the steps were a fall hazard because of improper slope, inadequate handrails, and lack of adequate traction. [Appellant] also introduced liability experts, but the jury found the theories of [Appellee's] experts to be a more credible and accurate description of the circumstances surrounding the fall. Significantly, [Appellant] did not produce any medical orthopedic experts or damages experts. On the other hand, [Appellee] was treated at Temple University Hospital by a Temple University orthopedic surgeon.

As a result of the fall, [Appellee's] right ankle was severely fractured, causing [Appellee] to miss five months of work, and the summer sessions [of Appellant]. The fracture required the surgical implantation of a plate and screws to stabilize [Appellee's] ankle. [Appellee] is in her twenties, and as her medical expert opined, is likely to

require significant future medical intervention.

The Commonwealth of Pennsylvania, and the Commonwealth of Pennsylvania Department of General Services, were dismissed from the case by Stipulation on April 8, 2013, leaving [Appellant] as the sole remaining Defendant. After jury selection, the trial in this matter took place from July [22], 2013 to July 25, 2013. The jury returned a verdict in the amount of $725,000.00; finding [Appellee] 10% negligent, and [Appellant] 90% negligent. Therefore, taking into account [Appellee's] comparative negligence, the Court molded the verdict to $652,500.00.

[Appellant] filed Post Trial Motions to which [Appellee] responded. After argument on same, [Appellant's] Post Trial Motions were denied, and judgment was entered on December 18, [2013] on the verdict, to which was added $2,201.62 in delay damages for a total final verdict amount of $654,201.62.[2]

Trial Ct. Op., 3/14/14, at 1-3 (citations to record omitted).

Appellant filed a timely notice of appeal on January 7, 2014, and a timely court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal[3] on January 31, 2014. The trial court issued its Rule 1925(a) opinion on March 24, 2014.

On appeal, Appellant argues the trial court erred in six evidentiary

---

[2] As we discuss **infra**, the court miscalculated the amount of total damages, and we modify it.

[3] Appellant's 1925(b) statement was seven pages in length and contained unnecessary factual and procedural history and inappropriate argument. Rule 1925(b)(4) requires a statement to "concisely identify each rule or error . . . ." Pa.R.A.P. 1925(b)(4)(ii). Nevertheless, we do not find waiver. **See Eiser v. Brown & Williamson Tobacco Corp.**, 938 A.2d 417, 421 (Pa. 2007).

rulings: (1) "admitting unauthenticated photographs, which were not provided during discovery;" (2) "allowing [Appellee's] counsel to question [Appellant's] witnesses about matters beyond both personal knowledge and work responsibility, as well as impermissible inquiry related to subsequent remedial repair;" (3) "precluding [Appellant's] cross-examination inquiry of [Appellee] regarding the actual cause of her injury;" (4) "precluding certain testimony from each of [Appellant's] two defense experts;" (5) "allowing [Appellee's] physician to speculate about possible future problems, despite his uncontroverted memorialized notation that [Appellee's] injury had resolved within a few months of the incident;" and (6) "admitting patently inflammatory evidence, implying 'hidden documents,' divorced from the actual merits of [Appellee's] claim."[4]  Appellant's Brief at 13, 16, 18, 19, 21, 23.  Appellant also argues the court erred in refusing its suggested points for jury charge concerning weather, duty in relation to magnitude of defect, self-serving testimony, Appellee's duty to keep a lookout for her own safety, landowner liability, permissible verdict influences, and speculative evidence. Finally, Appellant contends the verdict warrants a new trial or remittitur because it is "plainly excessive and exorbitant."  We address these *seriatim*.

This Court has stated:

> We will reverse a trial court's decision to deny a

_____

[4] These evidentiary challenges are preserved for appeal, as Appellant made contemporaneous objections to them at trial.

motion for a new trial only if the trial court abused its discretion. We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial. If the alleged mistake concerned an error of law, we will scrutinize for legal error. Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.

Where a jury's verdict is so contrary to the evidence that it shocks one's sense of justice, a new trial is warranted.

*Potochnick v. Perry*, 861 A.2d 277, 281-82 (Pa. Super. 2004) (citations

omitted).

The standard of review in assessing an evidentiary ruling of a trial court is extremely narrow. The admission or exclusion of evidence is a matter within the sound discretion of the trial court, which may only be reversed upon a showing of a manifest abuse of discretion. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Id.* at 282 (citations and quotation marks omitted).

Appellant first argues the trial court erred in admitting Appellee's photographs of the exterior steps of Ritter Hall, where Appellee fell, and of Shusterman Hall, another campus building. Appellant's Brief at 13 (citing N.T. Trial, 7/22/13, at 60-61); *see* N.T., 7/22/13, at 152-55. It claims the photographs were not properly authenticated because "[t]he record includes

no explanation of when, where or by whom the photographs were taken."
*Id.* Appellant further argues prejudice resulted because Appellee did not produce them until the deposition, three days prior to jury selection, of Appellant's mechanical expert, Howard Medoff, Ph.D. *Id.* at 15. We find no relief is due.

To authenticate or identify an item of evidence, Pennsylvania Rule of Evidence 901 requires a proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a).

At trial, Appellant argued—as it does in the instant appeal—the "photos were not produced as a part of [Appellee's] expert report," but instead Appellee's "counsel attempted to introduce [them] during the video deposition of [Appellant's] mechanical expert . . . ." N.T., 7/22/13, at 57. Appellee responded some of the photographs were "impeachment materials" and refuted Medoff's measurements of the steps. *Id.* at 60. The other photographs, Appellee contended, "relate to the friction strips that [she] questioned [Appellant's housekeeping employee, Kenneth] Murdter about at his deposition," and that Appellee's architecture expert, Walter Green, referenced the photographs in his report.[5] *Id.* at 60. Appellant then argued "the report that [Appellee was] attempting to rebut was served . . . back in

---

[5] Appellee further argued she had provided the photographs to Appellant's counsel. N.T., 7/22/13, at 60-61.

April;" we note trial was conducted in July. *Id.* at 61. The trial court overruled Appellant's objection to the photographs on the ground that they would be used to impeach. *Id.*

The record belies Appellant's instant authentication argument because Appellee's architecture expert testified the photographs depicted anti-slip adhesive strips that were on stairs near Shusterman Hall at the time of Appellee's slip and fall. *See* N.T., 7/22/13, at 152-55. The record also undermines Appellant's argument that presentation of these photographs resulted in surprise and prejudiced its ability to "properly investigate the referenced photos." *See* Appellant's Brief at 15-16. Appellant argues these photographs were not part of Green's report and were produced for the first time at trial. *Id.* Yet, as noted by the trial court in its opinion, Green referenced them in his expert report, "which was produced well before trial." Trial Ct. Op. at 5; Expert Rep. of Walter E. Green, 4/1/13, at 2, 3, 5, Ex. 1-9. Moreover, this report expressly noted the steps outside Shusterman Hall utilized abrasive coating at the time of Appellee's fall. Expert Rep. of Walter E. Green at 2, 5. Therefore, we agree with the trial court that no prejudice resulted, and hold the court did not abuse its discretion in admitting this photographic evidence. *See* Trial Ct. Op. at 5.

Appellant next argues the trial court erred by permitting its housekeeping employee, Vincent Washington, to testify on cross-examination about non-skid treads at Shusterman Hall. Appellant's Brief at

16, 17. Appellant also argues the court erred in allowing Washington and assistant superintendent of housekeeping, Kenneth Murdter, to testify as to subsequent repairs and investigations into other falls. *Id.* at 16-17. We disagree.

A lay witness may testify in the form of an opinion if it is "rationally based on the witness's perception . . . , helpful to clearly understanding the witness's testimony or to determining a fact in issue . . . , and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Pa.R.E. 701(a)–(c); *see* Pa.R.E. 702 (regarding testimony by expert witnesses). Evidence of subsequent remedial measures is not admissible to prove negligence if those measures "would have made an earlier injury or harm less likely to occur." Pa.R.E. 407. However, "[i]n certain circumstances[,] evidence of similar accidents occurring at substantially the same place and under the same or similar circumstances may, in the sound discretion of the trial [j]udge, be admissible to prove constructive notice of a defective or dangerous condition and the likelihood of injury." *Houdeshell ex rel. Bordas v. Rice*, 939 A.2d 981, 984 (Pa. Super. 2007) (citations, punctuation, and emphasis omitted).

Here, Appellee called Appellant's housekeeping employee, Washington, to testify on cross-examination as a lay witness. N.T., 7/22/13, at 63. Appellant objected to Appellee's line of questioning about external stairs near Shusterman Hall. *Id.* at 73. The trial court overruled Appellant's

objection on the ground that Washington could testify as to the facts. *Id.* Appellant asked whether Washington had seen the steps and was aware they had friction strips. *Id.* at 74. Washington answered affirmatively, stating only, "Yeah." *Id.*

Washington's personal knowledge of external steps on Appellant's campus is supported by the record. As part of his job responsibilities, he monitored the conditions of external staircases "all over" Appellant's campus. *Id.* at 64-65, 67. Whether the steps had friction strips constitutes a matter of simple observation rather than "scientific, technical, or other specialized knowledge." *See* Pa.R.E. 701(c). We thus agree with the trial court that "[t]his was fact testimony." *See* Trial Ct. Op. at 6.

Furthermore, the record does not support Appellant's argument that the trial court erred in permitting Murdter's testimony on "subsequent remedial repairs." *See* Appellant's Brief at 17. Appellee asked Murdter whether he asked his boss to inspect the Ritter steps after Appellee's fall. N.T., 7/22/13, at 86. Appellant objected, arguing Appellee improperly sought testimony on subsequent repair, but the court overruled this objection. *Id.* at 86-87. The trial transcript shows the ensuing testimony:

> [Appellee's Counsel:] Did you ask your supervisor to send someone out there to take a look at the step?
>
> [Murdter:] Yes. I said they had a complaint about it. Was there anything subsequent, that we have somebody come out to take a look at it, something like that.
>
> Q. Would it surprise you to know the step's still in that

condition today?

  A. I haven't been there in a little while, but probably—I don't know to be honest with you. I don't know.

*Id.* at 87.

We hold the trial court properly ruled the ban on subsequent remedial measure testimony did not apply to this testimony. Murdter testified he had no knowledge of any remedial measure taken by Appellant to make "an earlier injury or harm less likely to occur." *Id.* Therefore, Rule 407 did not apply. *See* Pa.R.E. 407. Moreover, Appellant's argument that the trial court abused its discretion in permitting his testimony about Appellant's investigation into similar accidents fails because such testimony "is admissible to demonstrate the existence of a hazardous condition." *See, e.g.*, *Yoffee v. Pennsylvania Power & Light Co.*, 123 A.2d 636, 648-49 (Pa. 1956) ("Authorities are almost unanimous in holding that evidence of the occurrence of similar accidents is admissible for the purpose of establishing the character of the place where they occurred, their cause, and the imputation of notice, constructive at least, to the proprietors of the establishment, of the defect, and the likelihood of injury.").

Appellant next argues "self-evident" prejudice resulted because the trial court precluded cross-examination of Appellee regarding how the "inherent nature" of her flip-flops and the rain caused her injury. Appellant's Brief at 18. Appellant claims the trial court's decision "denied the defense its sole opportunity to thoroughly explore actual causative evidence directly

with [Appellee]." *Id.* at 19. We disagree.

On cross-examination, Appellee testified about the flip-flops she was wearing when she fell, the rain on the day of her fall, and how she fell. N.T., 7/23/13, 25-28, 30. Appellee stated, "I was walking straight ahead, and I don't know which direction it went exactly, but it did go—I fell directly back, my legs right out in front of me [sic]." *Id.* at 29-30. Appellant then asked: "Isn't it true that in order for a twist to happen, one end [sic] has to remain stationary while the other end turns?" *Id.* at 30. Appellee objected, and after a sidebar discussion, the trial court sustained the objection. *Id.* at 30-33. We find the trial court properly precluded this testimony because an opinion as to the torque required to cause a twisting-type injury is "based on scientific, technical, or other specialized knowledge." *See* Pa.R.E. 701. Such an opinion is beyond the knowledge of a layperson. Appellant has not demonstrated Appellee possessed sufficient experience or specialized knowledge that qualified her to offer such an opinion.

Moreover, the record does not support Appellant's argument that the trial court's rulings deprived it of an opportunity to question Appellee about her flip-flops or the causative evidence. Rather, immediately prior to the court's ruling, Appellant cross-examined Appellee about her flip-flops, how she slipped, and how the rain led to her injury:

> [Appellant's Counsel:] Now you testified that you have been—you were wearing flip-flops—
>
> [Appellee:] Yes.

Q. —at the time?

A. That is correct.

Q. And these are the style of flip[-]flops that have a post between the big toe and the other toes—

[A.] Yes.

Q. —correct?  Now, isn't it true that when you are wearing flip[-]flops even on a flat surface, every step that you take, your heel comes away from the sole of the flip[-]flop?

A. Yes.

Q. So every step you take, there's a space that occurs between your heel and the flip[-]flop; is that correct?

A. Yes, I do suppose so.

*    *    *

[Appellant's Counsel:] So every step that you took in your flip[-]flops between here and the steps created a space between your heel and your flip-flop that the rain could get into; isn't that correct?

[Appellee:] Perhaps, yes.

Q. You testified that it was raining very hard when you ended your class, correct?

A. Yes.

Q. And that you and your friend, Mr. Prifti, waited until the rain slacked up as you said—

A. Yes.

Q. —before you decided to leave.  now in your deposition when we asked you, was it raining when you left the building, you said that it had been raining hard. You and your friend waited, but you decided to leave anyway, and you used the word [sic] you left anyway.

A. Well, it had still been raining, but it slowed down a little bit.

Q. So when you used the term that you decided to leave anyway, meaning despite the fact that it was still raining, was it still raining hard, or had it stopped raining?

A. It had slowed down.

Q. But it was still raining?

A. Yes.

Q. Now when we asked what caused you to fall, do you remember the answer that you gave us?

A. I took a step, and my foot slipped out from underneath of me.

Q. Could we look at page 56 of her deposition?  I'm looking at page 56, line 16.

*     *     *

[Appellant's Counsel:] I have marked off in ink the question and the answer and the question [sic].  Could you please read what that question says?

[Appellee:] It says, can you tell me what caused your fall, and I responded, the water from the rain.

Q. You didn't say anything about the steps or your shoes or slipping or anything like that?

A. There was still water on the step from the rain.

Q. But your answer was that the water caused you to fall.  That was your answer to us back in –

A. February.

Q. – February.  Are you aware that your physician has testified that your injury resulted from a twisting injury?  Are you aware of that?

A. Yes.

Q. And are you aware that the emergency department records show that your injury was a twisting-type injury? Are you aware of that?

A. Yes.

Q. And since both those health care providers report a twisting-type injury, how do you explain that your foot slipped straight out from under you without twisting?

A. I was walking straight ahead, and I don't know which direction it went exactly, but it did go – I fell directly back, my legs right out in front of me.

Q. I understand that. But I'd like for you to explain as to your foot itself. Can you explain how you encounter a twisting injury when your foot slipped straight out from under you?

A. I would assume from the momentum of me walking.

N.T., 7/23/13, at 25-30. At this point, Appellant posed the question that is the subject of this issue: "Isn't it true that in order for a twist to happen, one end has to remain stationary while the other end turns?" *Id.* at 30. In light of the forgoing exchange, we disagree with Appellant's claim that the court precluded it from questioning Appellee about the cause of her fall.

Appellant next challenges the trial court's rulings that limited its expert witness testimony. It argues the court erred in precluding Appellant's architecture expert, Ronald Kobelin, from testifying that part of his analysis included the coefficient of friction measurements taken by its biomedical engineering expert, Howard Medoff. Appellant's Brief at 19-21. Specifically, the trial court sustained the objection to Appellant asking Kobelin: "Do you know whether the textured granite steps at Ritter Hall reach the .5

- 14 -

coefficient of friction level?" N.T., 7/23/13, at 102. Appellant also contends the court erred in precluding Medoff from testifying about the opinion of Appellee's architecture expert, Walter Green. *Id.* at 20. Appellant argues these decisions were "flatly contrary to governing law" because an expert is permitted to testify on an opinion of another expert. *Id.* at 21. We disagree.

As with other evidentiary rulings, "[t]he admissibility of expert testimony is soundly committed to the discretion of the trial court, and the trial court's decision will not be overruled absent 'a clear abuse of discretion.'" *Hatwood v. Hosp. of Univ. of Pa.*, 55 A.3d 1229, 1239 (Pa. Super. 2012).

Appellant's claim that the trial court erred in precluding Kobelin from testifying about his knowledge of the coefficient of friction on the Ritter Hall steps is without merit. Any potential harm or prejudice resulting from this ruling was cured by Kobelin's subsequent testimony that the Ritter Hall steps met the applicable codes, regulations, and industry standards based on their coefficient of friction measurements. *See Potochnick*, 861 A.2d, at 281; N.T., 7/23/13, at 109-10. Incorporating the referenced .5 coefficient of friction, he expressly stated: "[T]he textured granite surface applies a coefficient of friction far exceeding .5 and in my opinion is very safe under any kind of wet conditions or dry conditions." *Id.* at 110. Kobelin also testified that slip resistance is measured by a surface's coefficient of friction,

a measurement of .5 is the industry standard, and lower coefficients of friction may also be safe. *Id.* at 101-02, 105-08.

Appellant's argument that the trial court erred in precluding testimony of its biomedical engineering and human factors expert, Medoff, about the findings of Appellee's architecture expert, Kobelin, also lacks merit. Medoff was qualified to testify about biomechanical engineering and human factors analysis, and he had a background in pedestrian walkway safety and footwear. N.T. Trial, 7/16/13, at 6-7, 8-9.

"Experts are permitted only to render opinions in the specific field(s) in which they have expertise, and not to speculate outside their fields." *Tucker v. Bensalem Twp.*, 987 A.2d 198, 204 (Pa. Cmwlth. 2009);[6] *see Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534, 539-40 (Pa. Super. 2003) ("[E]ven physicians have been held unqualified to testify in specialty areas in which they are not experienced or educated."). The *Viguers* Court found no error in the trial court's holding that the plaintiff's pulmonary physician expert was not qualified to testify about the defective design of the defendant's cigarettes or safer cigarette alternatives. *Viguers*, 837 A.2d at

---

[6] "We are not bound by decisions of the Commonwealth Court; however such decisions provide persuasive authority. Thus, we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." *See Graver v. Foster Wheeler Corp.*, 96 A.3d 383, 387 n.6 (Pa. Super. 2014) (citations omitted), *appeal denied*, 2015 WL 669800 (Pa. Feb. 4, 2015).

539. Although this purported expert treated smokers and "studied the tobacco industry for many years, including articles, journals, public and internal documents relating to the manufacture of cigarettes," he was not qualified as an expert in the "manufacture" or "design process" of cigarettes specifically. *Id.* at 539-540 n.5; *see also Christiansen v. Silfies*, 667 A.2d 396, 403 (Pa. Super. 1995) (ruling trial court did not err in holding trooper could not testify about regulations involving driving standards even though he was expert on safety inspections of motor carriers and certain related regulations). Rather, the Court noted, "cigarette design is a field far removed from medicine," and requires specific industry knowledge. *Viguers*, 837 A.2d at 539-40 n.5.

The trial court in the current case did not err in holding Medoff was not qualified to testify about Kobelin's architectural conclusions. Although Medoff possessed credentials in the field of safe walking generally, he was not qualified as an expert in architecture and did not purport to be an expert in architecture. *See* N.T., 7/16/13, at 6-7, 8-9. Moreover, no prejudice resulted where Appellant cross-examined Appellee's architecture witness, Walter Green, and where Kobelin testified about architecture on behalf of Appellant. *See* N.T., 7/22/13, at 111-15, 158-73; N.T., 7/23/13, at 74-144.

Appellant argues the trial court erred in denying its motion *in limine* to preclude "future harm" testimony of Appellee's treating physician, Dr. Andrew J. Meyr. Appellant's Brief at 21-23. We note that Dr. Meyr was

employed by Temple Hospital at the time he treated Appellee. Appellant asserts such testimony is inadmissible by law due to its "reliance on conjecture and speculation to establish the essential elements of [Appellee's] case." *Id.* at 21. Appellant further purports that Dr. Meyr stated on the record that Appellee's injuries resolved within a few months of the accident. *Id.* at 21-23. We disagree.

We note that in his expert report, Dr. Meyr stated:

> [Appellant's] prognosis for her left ankle is fair. Typically after a fracture of the ankle, such as the one she sustained, future resultant deformities could include but are not limited to: Osteoarthritis of the ankle, damage of the subchondral bone of the talus bone, painful ankle synovitis, inability to ambulate with a normal gait pattern, significant pain affecting activities of daily living, early degenerative changes of the affected limb and the contralateral limb due to abnormal gait as well as inflammation of tendous and ligaments due to altered gait. If she does go on to have significant arthritic changes, these often can cause a lifetime of pain and disability, and often require future invasive procedures such as arthroscopic examinations, joint replacements and even fusions, to help control pain. Thankfully it does not appear as though any of these complications have developed to my knowledge yet but she is certainly at risk for the future development of them at some point in the future, especially considering her young age at the time of the injury.[7]

Expert Rep. of Andrew J. Meyr, 3/22/13, at 2.

---

[7] In its argument, Appellant truncates the relevant opinion of Dr. Meyr. In so doing, Appellant ignores Dr. Meyr's opinion that Appellee "is certainly at risk for the future development of [resultant deformities] at some point in the future, especially considering her young age at the time of the injury." *Compare* Appellant's Brief at 22-23, *with* Expert Rep. of Andrew J. Meyr.

Appellee presented the deposition testimony of Dr. Meyr by video wherein he testified that Appellee's injury increased her risk of developing arthritis, chronic pain, and chronic swelling. N.T. Trial, 7/17/13, at 27-29. He further testified that if degenerative arthritis develops and preliminary treatments are ineffective, Appellee may require fusion or replacement of her joint. *Id.* at 29-30. Dr. Meyr estimated the cost of this procedure at $50,000 to $60,000. *Id.* at 30.

The trial court correctly noted that testimony about Appellee's medical prognosis is relevant and admissible in a determination of damages. Trial Ct. Op. at 7 (citing *Kovach v. Central Trucking, Inc.*, 808 A.2d 958, 961 (Pa. Super. 2002)). The court also noted testimony regarding a prognosis "need not be within a reasonable degree of medical certainty" when applied to damages. *Hamil v. Bashline*, 392 A.2d 1280, 1288-89 n.10 (Pa. 1978); *see Gradel v. Inouye*, 421 A.2d 674, 680 (Pa. 1980) ("[A] doctor properly may be allowed to explain the possible future effects of an injury, and with less definiteness than is required of opinion testimony on causation.") (citations omitted). Dr. Meyr testified that although Appellee did not currently suffer from arthritis or any related affliction, she was at risk for developing arthritis and other afflictions. Therefore, Appellant's argument, that the trial court's ruling runs *contra* to the law, lacks merit.

Appellant's next evidentiary issue concerns an initial response it gave to Appellee's discovery request about "the existence of same-site fall-related

incident reports." Appellant's Brief at 24. Appellant avers the following. In October 2012,[8] it responded, "[f]ollowing a due diligence investigation," "None. But [Appellant] reserves the right to supplement this response." *Id.* "[W]ithin a week of trial, [Appellee] sent a second request on the same subject." *Id.* Appellant's counsel "decided to personally inquire," "learned that indeed two prior falls had occurred at the site—albeit dissimilar in nature," and "then promptly delivered" the discovery to Appellee. *Id.* In the instant appeal, Appellant avers the record thus "confirms defense counsel's adherence to the continuing duty to disclose." *Id.*

Appellant then maintains the court erred in allowing Appellee "to project onto a large screen a magnified image of the initial interrogatory— with [Appellant'] response—for the jury to view." *Id.* Appellant argues Appellee's presentation to the jury of Appellee's initial response to an interrogatory about any other reports of falls on the Ritter Hall steps resulted in prejudice. *Id.* at 23, 27. Appellant further contends that this impermissibly allowed the jury to infer nefarious intent where Appellant properly updated its response and where any delay in production resulted from ordinary discovery errors. *Id.* at 25-26. We disagree.

At trial, Appellant's assistant superintendent of housekeeping, Kenneth Murdter, testified he had never received a report of anyone other than

---

[8] The exact dates of Appellant's interrogatories and Appellee's responses are not readily ascertainable in the record.

Appellee falling on the Ritter Hall steps. N.T., 7/22/13, at 89. On cross-examination, Appellee presented its discovery request to the jury and stated Appellant did not send "additional reports of people that slipped and fell" until July 19, 2013. *Id.* at 94. Appellee asked Murdter if he knew "why it took until July 19, 2013," the business day before trial, to respond. *Id.* Appellant's counsel objected, stating, "[W]e only received the notice to produce two days before the date of this letter." *Id.* Appellee then presented to the jury the original discovery request for those records. *Id.* Appellant again objected, arguing, "[U]nless [Murdter is] going to be presented with the response to that [initial interrogatory], I think this line of questioning is grossly misleading." *Id.* at 95. The trial court allowed Appellee to proceed, reasoning someone would have had to answer the interrogatories on behalf of Appellant. *Id.* at 95-96. Appellee then presented Appellant's response, which indicated there were no such incident reports. *Id.* at 96. Appellant did not object to the presentation of its response. *Id.* at 96-97.

In its opinion, the trial court found Appellant "failed to produce" two incident reports responsive to Appellee's discovery requests "until the day before trial despite several requests by [Appellee]." Trial Ct. Op. at 8.

Any party may impeach the credibility of a witness "by any evidence relevant to that issue, except as otherwise provided by statute or these rules." Pa.R.E. 607(b). "Evidence is relevant if . . . it has any tendency to

make a fact more or less probable than it would be without the evidence, and . . . the fact is of consequence in determining the action." Pa.R.E. 401.

We find the initial August 2012 interrogatory undercuts Appellant's representation that it "only received the notice to produce two days before" it produced the incident reports. *See* N.T., 7/22/13, at 94. Further, Appellant waived its objection to the presentation of its response when it requested Murdter be shown the response and then failed to object to Appellee showing it. *Id.* at 95-97.

Appellant similarly argues it is entitled to a new trial because the court erred in "allowing [certain] cross-examination [of its architecture expert, Ronald Kobelin] regarding additional photographs in front of the jury." Appellant's Brief at 27. Appellant contends the trial court agreed that cross-examining Kobelin about photographs he took but that Appellant did not produce to Appellee "would give the impression that there was duplicity by defense counsel, and that same was 'hiding' something." *Id.* at 28. We find this issue waived.

The trial transcript shows the following exchange occurred in front of the jury, and then a sidebar discussion ensued:

> [Appellee's Counsel:] Did you take any photographs at the scene, at the scene of the accident?
>
> [Kobelin:] I did.
>
> Q. Where are they?
>
> Trial Court: All right. Do you have—go ahead.

[Appellee's Counsel:] I've never been provided with any photographs.  Were they maybe attached to Dr. Medoff's report instead of yours?

[Kobelin:] No.  I sent mine separate.

Q. How many did you take?

A. Six, seven maybe, six, seven maybe, general.

[Appelle's Counsel:] Can we see you sidebar [sic], Your Honor?

N.T., 7/23/13, at 113-14.

A sidebar discussion out of the jury's hearing followed.  Appellee's counsel claimed she never received any photographs corresponding to Kobelin's report.  *Id.* at 114-15, 117-18, 125, 127-28.  Appellant claimed it forwarded everything it received to Appellee, *id.* at 114, and that it did not receive the other three or four photographs that Kobelin testified he sent to Appellant.  *Id.* at 114, 125-26.  The parties also discussed how the three photographs Appellant presented at trial compared to those Appellee presented.  *Id.* at 127-29.  The trial court determined the parties would examine Kobelin regarding the missing photographs outside the presence of the jury.  *Id.* at 130-31.

The trial court recessed the jury.  *Id.* at 132.  Appellee's counsel then asked Kobelin if he sent the six or seven photographs to Appellant, and Kobelin responded he emailed them to Appellant.  *Id.* at 140-41.  Appellee's counsel then requested Kobelin to send the missing photographs to the court.  *Id.* at 141.  Appellant also asked Kobelin to clarify to which exhibits

the three photographs presented at trial corresponded. *Id.* at 139-40. The proceedings concluded that day without the jury reentering the court room. *Id.* at 144.

We find Appellant's argument meritless because Appellee did not cross-examine Kobelin about the missing photographs in the presence of the jury. In support of its argument, Appellant cites thirty-two pages, pages 113 through 144,[9] of the July 23, 2013 trial transcript. *See* Appellant's Brief at 28 n.99. However, our review of those pages indicates the jury only heard Kobelin testify that he took six or seven photographs and that he sent them to Appellant. N.T., 7/23/13, at 113-14. The remainder of the discussion regarding these photographs occurred either at sidebar, *id.*, at 114-15, 117-18, 124-28, 130-31, or with the jury recessed. *Id.*, at 138-43. Likewise, Appellant proffers that its objection was overruled, but does not cite to the place in the transcript where it made the objection or where the trial court overruled it. *See* Appellant's Brief at 28.

In its second issue, Appellant argues it should be afforded a new trial because the court improperly refused all thirty-eight of its points of charge and, specifically, refused its fourteen points related to weather, self-serving testimony, Appellee's duty "to keep a lookout for her own safety," landowner

---

[9] Appellant cites to pages 1130a through 1140a of the reproduced record. Appellant's Brief at 28 n.99. These correspond to pages 113 through 144 of the notes of the July 23, 2013 testimony.

liability, permissible verdict influences, and speculative evidence.

Appellant's Brief at 29. The sum of Appellant's argument is as follows:

> All of these rejected points have three things in common: each accurately states governing law; each responds to the facts in the instant litigation; and the charge actually given to the jury remained silent as regards each governing precept. This is contrary to the rules of law as pertaining to jury instructions, as detailed in the foregoing Standards of Review section.

***Id.***[10]

It is well-settled that:

> Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case.
>
> \* \* \*
>
> [I]n reviewing a trial judge's charge, the proper test is not whether certain portions taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed **and whether that error was prejudicial to the complaining party.**

***Polett v. Pub. Commc'ns, Inc.***, 83 A.3d 205, 216 (Pa. Super. 2013) (citations omitted) (emphasis added), *appeal granted on other grounds*, 91 A.3d 1237 (Pa. 2014).

Appellant makes no argument regarding prejudice; we therefore find

---

[10] Appellant's entire discussion on these jury instructions spans less than a page. Appellant's Brief at 29. It is wholly devoid of any legal authority even though Appellant notes, "[t]he applicable law accompanies each point." ***Id.*** at 29 n.102. Nevertheless, we decline to find waiver on this point.

no relief is due. ***See Polett***, 83 A.3d at 216.

Appellant also argues the trial court erred in reading to the jury sections 602.3 and 602.4 of the Philadelphia Maintenance Code because they "include[ ] language strongly suggesting it is applicable **only** to interior passageways," and because they contradict the law regarding Appellant's duty to "provide a **reasonably** safe egress" and its duty to retrofit. Appellant's Brief at 29-30. Instead, Appellant urges, the trial court committed reversible error by rejecting its points for charge, "which specifically cautioned that no such duty [to retrofit] exists in Pennsylvania." ***Id.*** at 30. We disagree.

Sections 602.3 and 602.4 of the Philadelphia Maintenance Code in effect at the time of trial provided:

> 602.3: Stairways, handrails, and guards: Every exterior and interior flight of stairs having more than three risers shall have handrails, and every open portion of stair landing, balcony, deck, porch, or other walking surface which is more than 30 inches above the floor or grade below shall have guards. Handrails shall not be less than 30 inches nor more than 42 inches high measured vertically above the nosing of the tread and above the finished floor of the landing or walking surfaces. Guards shall not be less than 30 inches high above the floor to the walking surface.

> 602.4: Walking surfaces. Walking surfaces of aisles, passageways, corridors, stairways and other elements or means of egress shall be maintained free of warping, loose or torn surfaces and any other condition which does not provide a safe means of egress.

N.T. Trial, 7/24/13, at 93-94 (citing PHILA., PA., PROPERTY MAINTENANCE CODE,

§§ 602.3, 602.4 (2d. ed. 2d. prtg. 2007)).

The law is well established that the "refusal to give a requested instruction containing a correct statement of law is ground for a new trial unless the substance thereof has otherwise been covered in the court's general charge." ***Potochnik v. Perry***, 861 A.2d 277, 285 (Pa. Super. 2004) (emphasis omitted).

The express language of the Philadelphia Property Maintenance Code belies Appellant's claim that it "includes language strongly suggesting it is applicable only to interior passageways." Section 602.3 states, "Every exterior and interior flight of stairs . . . ." ***Compare*** Appellant's Brief at 29-30, ***with*** N.T., 7/24/13, at 93-94 (citing PHILA., PA., PROPERTY MAINTENANCE CODE, §§ 602.3, 602.4 (2d. ed. 2d. prtg. 2007)).

Appellant's argument that section 602.4 "easily yields an interpretation yielding a duty to **absolutely** maintain safe egress, as opposed to the well-settled premises liability edict to provide a **reasonably** safe egress" also lacks merit. ***See*** Appellant's Brief at 30. The trial court properly instructed the jury on negligence rather than strict liability, and on Appellant's duty as a property owner to Appellee as an invitee, as reflected in a review of the entire record. N.T., 7/24/13, at 90-91, 93-94; ***see Potochnick***, 861 A.2d at 283. The trial court instructed on negligence as follows:

> The legal term negligence, otherwise known as carelessness, is absence of ordinary care that a reasonably prudent person would use in the circumstances presented here. Negligent conduct may consist either of an act or a

> failure to act when there's a duty to do so. In other words, negligence is the failure to do something that a reasonably careful person would do or doing [sic] something that a reasonably careful person would not do in light of all of the surrounding circumstances established by the evidence in this case.

N.T., 7/24/13, at 90-91. The trial court instructed on the duty of care an owner of land has to an invitee as follows:

> This duty [of care to an invitee] is owed generally, it's to invitees generally. An owner of property is required to use reasonable care in the maintenance and use of the land and to protect invitees from foreseeable harm.
>
> An owner of land or property: An owner of property is required to inspect the premises and to discover dangerous conditions. An owner of his property is liable for harm caused to invitees by a condition on the property if the owner knows or by using reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm, and the owner should expect that the invitees will not discover or realize the danger or will fail to protect themselves against it and the owner fails to use reasonable care to protect the invitees against the danger.
>
> An owner of property is liable for any harm that the owner should have anticipated regardless of whether the danger is known or obvious.

*Id.* The trial court also provided context to the code by instructing, "a violation of [the] code would be evidence that you should consider along with all the other evidence presented on the question of whether [Appellant] was negligent." *Id.* at 93.[11] Appellant does not explain how "applying §

---

[11] Appellant does not address this language in its argument. Rather, Appellant truncates the court's jury charge in its excerpt so as to exclude this portion. **Compare** Appellant's Brief, App'x E, **with** N.T., 7/24/13, at 93.

602.4 [of the Philadelphia Property Maintenance Code] in the instant case is directly contrary to the well-established rule precluding a duty to retrofit." *See* Appellant's Brief at 30. As relevant here, the Philadelphia Property Maintenance Code provides only that "[w]alking surfaces of . . . stairways . . . shall be maintained free of . . . any other condition which does not provide safe means of egress." *See* N.T., 7/24/13, at 93-94 (citing PHILA., PA., PROPERTY MAINTENANCE CODE, §§ 602.3, 602.4 (2d. ed. 2d. prtg. 2007)). The Code does not impose an absolute duty to retrofit. Indeed, the code expressly states, "In certain cases, the [Philadelphia] Property Maintenance [C]ode may require retrofit of basic features to provide a minimum level of safety, welfare and health in those structures build prior to the establishment of such provisions in the other codes." *See* PHILA., PA., PROPERTY MAINTENANCE CODE, "History" (2d. ed. 2d. prtg. 2007)). Appellant conceded this position at trial:

> [The Philadelphia Maintenance Code] says that all property, interior, outerior [sic] must be safe, period. It does not specify slope or coefficients of friction. It doesn't specify any of that. Only it says [sic] these premises should be made safe. And **unless they've been deemed to be unsafe**, then there's no requirement to retrofit.

*See* N.T., 7/24/13, at 29 (emphasis added).

Lastly, Appellant argues the trial court erred in denying its motion for a new trial or, alternatively, remittitur because the jury verdict was "plainly excessive and exorbitant." Appellant's Brief at 31. It contends the verdict "speaks for itself" as shocking because Appellee's "expert noted that the

injury had resolved by December 2010," Appellee "returned to her usual waitressing and physical fitness jobs within months of the incident," and the verdict exceeded Appellant's out-of pocket expenses, compensation demanded, and medical expenses. *Id.* at 31-33. We disagree.

"The grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court." ***Paliometros v. Loyola***, 932 A.2d 128, 134 (Pa. Super. 2007). Our standard of review is to "determine whether the trial court abused its discretion or committed an error of law" in reaching its decision. *Id.* "This [C]ourt will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice." *Id.* (citations omitted). In making this determination, this Court may consider, *inter alia*, the following factors:

> (1) the severity of the injury; (2) whether the [p]laintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the [p]laintiff . . . ; (3) whether the injury will affect the [p]laintiff permanently; (4) whether the [p]laintiff can continue with his or her employment; (5) the size of the [p]laintiff's out-of-pocket expenses; and (6) the amount [the p]laintiff demanded in the original complaint.

*Id.* at 135 (citations omitted).

Evidence adduced at trial showed Appellee's injury was severe and manifested by objective physical evidence where she required multiple surgeries. ***See*** Trial Ct. Op. at 9-10. Her treatment "required the surgical implantation of a plate and screws to stabilize [her] ankle." *Id.* at 2.

Appellee took pain medication and received stomach injections to prevent blood clots. *Id.* at 9-10. She is "likely to require significant future medical intervention." *Id.* at 2. Despite Appellant's argument otherwise, the jury could have reasonably found Appellee is at risk for developing serious pain and deformities based on her injury. *See Gaydos v. Gaydos*, 693 A.2d 1368, 1371 (Pa. Super. 1997) ("The fact finder is free to believe all, part, or none of the evidence and [this] Court will not disturb the credibility determinations of the [trial] court"). Although Appellee eventually returned to work, the evidence showed she was bedridden for weeks and missed her summer classes due to her injury. *See* Trial Ct. Op. at 10. The molded verdict of $654,701.62,[12] including delay damages, will compensate Appellant for her expenses, injuries, pain and suffering, and risk of future harm.

While this verdict exceeded out-of-pocket expenses, it "does not shock [this Court's] sense of justice when considering" these factors. *See Bennyhoff v. Pappert*, 790 A.2d 313, 321 (Pa. Super. 2001) (affirming trial court's denial of remittitur and holding verdict was not excessive—even though it was 120 times greater than plaintiff's medical expenses—when considering her "previously active lifestyle, her multiple treatments and surgeries, and her relative youth at the time of the accident").

---

[12] As we discuss *infra*, the trial court miscalculated the total amount of damages, and we modify it.

Appellant emphasizes Dr. Meyr's statement, "Thankfully it does not appear as though any [future] complications have developed to my knowledge yet," and that Appellee is "[d]oing well without signs of complications." Appellant's Brief at 32. However, as noted *supra*, Appellant does not address Dr. Meyr's opinion that Appellee "is certainly at risk for the future development of [resultant deformities] at some point in the future, especially considering her young age at the time of the injury." Expert Rep. of Andrew J. Meyr, 3/22/13, at 2.

Finally, we *sua sponte* review the amount of damages entered by the trial court. As stated above, the jury found Appellee had damages of $725,000, but also found her 10% negligent, and thus Appellee's award was reduced to **$652,500**. Appellee subsequently requested delay damages, and on December 18, 2013, the court awarded delay damages of $2,201.62. However, the court's order misstated the underlying jury award as **$652,000**, and accordingly miscalculated the total damages as $654,201.62. Because this error is patently obviously, we modify the total judgment to the correct amount of $654,701.62. *See Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 981-82 (Pa. Super. 2011) (*per curiam*), *aff'd*, 106 A.3d 656 (Pa. 2014).

Based on the foregoing, we discern no merit to Appellant's arguments that the trial court erred in its evidentiary rulings, its charge to the jury, and its denial of remittitur. We therefore affirm the trial court's July 25, 2013

verdict entered in favor of Appellee, but correct the court's patent mathematical error.

Judgment as modified affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/22/2015